US ECOLOGY, INC., A CALIFORNIA CORPORATION, APPELLEE, V. STATE OF NEBRASKA, DEPARTMENT OF ENVIRONMENTAL QUALITY, AN EXECUTIVE DEPARTMENT AND AGENCY OF THE STATE OF NEBRASKA, ET AL., APPELLANTS.

601 N.W. 2d 775

Filed October 29, 1999.    No. S-98-412.

Don Stenberg, Attorney General, William M. Lamson, Jr., Special Assistant Attorney General, of Lamson, Dugan & Murray, and Linda L. Willard for appellants.

Steven G. Seglin and David A. Jarecke, of Crosby, Guenzel, Davis, Kessner & Kuester, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

US Ecology, Inc. (USE), commenced this action for declaratory judgment, seeking (1) a declaration that the placement of fill in a depression less than 1 acre in size located on the proposed site of a low-level radioactive waste (LLRW) disposal facility and the creation of a new wetland in mitigation, approximately 2 acres in size, located off the disposal site do not constitute commencement of construction; (2) a declaration that the Nebraska Department of Health and Human Services (DHHS) and its LLRW program manager have no jurisdiction over the determination of whether the fill and mitigation constitutes commencement of construction; and (3) injunctive relief against the director of DHHS and the director of the Nebraska

Department of Environmental Quality (DEQ), enjoining them from interfering with the fill and mitigation proposed by USE.

## SCOPE OF REVIEW

A jurisdictional question which does not involve a factual dispute is determined by an appellate court as a matter of law, which requires the appellate court to reach a conclusion independent from the lower court's decision. See *Holste v. Burlington Northern RR. Co.*, 256 Neb. 713, 592 N.W.2d 894 (1999).

## FACTS

USE is a California corporation authorized to transact business in the State of Nebraska, with its principal office located in Lincoln, Lancaster County, Nebraska. USE is the developer of a regional disposal facility for the Central Interstate Low-Level Radioactive Waste Compact (Compact), which disposal facility has been designated by the Central Interstate Low-Level Radioactive Waste Commission (Commission) for the commercial disposal of LLRW generated in the states of Arkansas, Kansas, Louisiana, Nebraska, and Oklahoma. USE has filed an application to construct such facility near Butte, Nebraska.

Pursuant to Neb. Rev. Stat. §§ 81-1586 and 81-1599 (Reissue 1994), DEQ is the agency of the State of Nebraska responsible for licensing and regulation of the disposal facility designated by the Commission. DEQ has authority to license and develop a program for the regulation of LLRW in order to protect the public health, safety, and welfare, as well as the environment. At the time of this action, Randolph Wood was the director for DEQ, and Jay D. Ringenberg was the LLRW program manager for DEQ.

In accordance with the Low-Level Radioactive Waste Disposal Act (Disposal Act), Neb. Rev. Stat. §§ 81-1578 to 81-15,116 (Reissue 1994 & Cum. Supp. 1996), DEQ has promulgated certain regulations concerning the construction of the facility designated by the Compact. " 'Commencement of construction' means any clearing of land, excavation, or other substantial action that may affect the environment of a facility." 194 Neb. Admin. Code, ch. 1, § 008 (1994). "Failure to obtain a license prior to commencement of construction may be grounds

for denial of a license." 194 Neb. Admin. Code, ch. 3, § 001.03 (1994).

At the time of this action, Gina C. Dunning was the director of DHHS, and Cheryl K. Rogers was the LLRW program manager for DHHS. In June 1990, DEQ and DHHS entered into a "Memorandum of Understanding," which stated: DHHS "has the authority to regulate LLRW management, except for the commercial disposal of LLRW in a disposal facility designated by the Central Interstate LLRW Compact Commission . . . ." Pursuant to this memorandum, DEQ and DHHS agreed that there would be one license application and that both agencies would participate in the licensing process.

On July 27, 1990, USE submitted an application with the State of Nebraska for the construction, operation, and ultimate closure of an LLRW disposal facility. The original application was for a 320-acre site located in Boyd County (first site). During the pendency of this application, USE made certain improvements and modifications to the first site, including the installation of a gravel road and placement of a security trailer, equipment shed, fencing, and meteorological equipment.

In January 1993, DEQ and DHHS determined that the first site was not suitable because of the existence of a number of areas which were identified by the U.S. Army Corps of Engineers and DEQ as wetlands. Both DEQ and DHHS issued a notice of intent to deny the license application based solely on the existence of these wetlands. USE withdrew its original application, and on August 30, filed a revised license application (revised application) regarding 110 acres located in the southwest corner of the first site (second site). At the time the revised application was filed, no federal or state agency had identified any wetland within the boundaries of the second site. Ringenberg, the LLRW program manager for DEQ, testified that upon receipt of the revised application and review of an aerial photograph of the second site, he thought that an area in the second site might be a wetland. The area was personally examined, and upon determining that there appeared to be a possible wetland area, Ringenberg requested the Corps of Engineers to examine the area. This area has become known as the D-3 wetland.

Subsequently, USE hired an engineering firm to investigate the D-3 wetland. The engineering firm examined the site and determined that it was a "temporary wetland," which was wet only during rain. The vegetation that was designated "wetland vegetation" was a patch in the center that "you could put your arms around." The quality of the D-3 wetland was low, and the depression averaged 3 inches in depth.

USE then applied to the Corps of Engineers for a "404 permit" under the "Nationwide 26 Program" to fill the wetland. A 404 permit is available when the Corps of Engineers believes that a proposed project will have an insignificant impact on the environment. Public notice of the Corps of Engineers' intent to approve USE's application under the Nationwide 26 Program was mailed directly to DEQ on July 16, 1996. DEQ received notice of the intended decision but did not respond or offer any comments to the Corps of Engineers. A representative of DEQ stated that it did not respond because it wanted USE to get the permit.

USE's 404 permit application provided for mitigation that complied with DEQ's requirements. DEQ approves 404 permits under the Nationwide 26 Program as long as the applicant complies with the requirements that for any wetland taken, there is a replacement or mitigation wetland created $1\frac{1}{2}$ times the size of the wetland taken and that the mitigation wetland created consists of the same type of vegetation as the wetland taken. The mitigation area proposed by USE would be located on the first site but not within the boundary of the second site.

On August 9, 1996, the Corps of Engineers issued a 404 permit giving USE until January 21, 1997, to complete the fill and mitigation work. The Commission had also given USE permission to fill the depression. This would require placing 400 cubic yards of fill in the D-3 wetland.

On September 6, 1996, USE wrote to Ringenberg and Rogers to inform them that the Corps of Engineers had issued USE a 404 permit to fill the D-3 wetland. In a joint letter dated October 21, Ringenberg and Rogers stated: "We have determined that this activity does constitute facility construction. . . . Therefore, by this letter we are advising you not to proceed with your plans at this time. It is acceptable to proceed only upon issuance of a

license." In response, USE claimed that it did not consider this work to be a substantial activity and requested that DEQ and DHHS reconsider their prior conclusion. The agencies refused to change their position.

On June 17, 1997, USE commenced this declaratory judgment action against DEQ and DHHS and their directors pursuant to Neb. Rev. Stat. § 25-21,149 et seq. (Reissue 1995), the Uniform Declaratory Judgments Act. On February 26, 1998, the Lancaster County District Court issued a memorandum and judgment. The following facts regarding the D-3 wetland were found to be undisputed: The wetland averaged 3 inches in depth and measured less than 1 acre. The wetland vegetation was an area not larger than what one could put one's arms around. The depression had no relation to the ground water and was merely a depression which collected water during heavy rains. Aside from the vegetation-type wetland, the area consisted primarily of weeds common to Nebraska. With the approval of the State of Nebraska, the Corps of Engineers had issued a permit authorizing this depression to be filled.

The district court found that the fill activity located on the second site did not involve the clearing of land or excavation and that DEQ had not done any monitoring, testing, sampling, or observation of any activity that would be impacted by filling the D-3 wetland. The court concluded that the fill and mitigation authorized by the 404 permit would not have an environmental impact.

The district court also found that the mitigation wetland area was located on the first site, but not on the second site. The court concluded that in the event that a license was issued by DEQ to permit the construction of the disposal facility, 12 to 18 inches of soil on the entire 110-acre tract, including the amount of fill placed in the D-3 wetland, would be removed to prepare the site for construction.

The district court further found that neither DHHS nor any of its officers or employees had statutory authority to render any decision regarding USE's application for a license to construct an LLRW facility and that any decision, order, rule, or regulation which DHHS made was void as being beyond the scope of its authority. The court declared that the construction of the mit-

igation wetland was not the subject of the pending license application and was, therefore, beyond the scope of the authority of both DEQ and DHHS as promulgated by the Disposal Act and the Radiation Control Act, Neb. Rev. Stat. § 71-3501 et seq. (Reissue 1996).

In addition, the district court found that DEQ had statutory authority to regulate and control the application for and construction of an LLRW disposal facility for which USE had made application, but found that DEQ could not properly deny USE's license solely on the basis of the fill and mitigation work being done before the license application was approved.

The district court subsequently enjoined DHHS from (1) taking or threatening to take any action regarding USE's revised application and (2) taking any action on the fill and mitigation project which USE intended to carry out pursuant to the 404 permit issued by the Corps of Engineers. The court further enjoined DHHS from attempting to enforce any rule, decision, or regulation relating to license applications.

In addition, the district court enjoined DEQ from (1) taking any action or threatening to take any action on USE's revised application because of work performed in reliance on the 404 permit and (2) attempting to enforce any decision, rule, or regulation relating to the fill and mitigation project.

Although USE requested that DEQ and DHHS be required to pay the costs of this action, the district court did not address this issue in its order.

## ASSIGNMENTS OF ERROR

In summary, the State makes the following assignments of error: (1) The district court lacked jurisdiction over this dispute because USE failed to exhaust all available administrative remedies, because USE did not attack the validity of an agency rule or regulation, and because USE sought declaratory relief against the State, in violation of the doctrine of sovereign immunity; (2) the district court erred in granting injunctive relief because the injunction was against the State and its officers and agents, and USE failed to prove irreparable harm or inadequate remedy at law; (3) the district court erred in finding that DHHS lacked authority to render any decision regarding USE's license appli-

cation; and (4) the district court erred in finding that DEQ's determination that the construction of the wetland fill and mitigation constituted commencement of construction and DEQ's "threat" that the commencement of construction prior to license approval could be grounds for the denial of USE's license application were " 'beyond the scope of [DEQ's] authority, were lacking in reasonable relation to the statutes or its own regulations and were not a reasonable exercise of the authority [DEQ] has.' " Brief for appellants at 5.

## ANALYSIS

Before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *In re Application of SID No. 384*, 256 Neb. 299, 589 N.W.2d 542 (1999). While it is not a constitutional prerequisite for jurisdiction, the existence of an actual case or controversy is necessary for the exercise of judicial power. See, *State v. Dorcey*, 256 Neb. 795, 592 N.W.2d 495 (1999); *State v. Jacob*, 256 Neb. 492, 591 N.W.2d 541 (1999).

A court decides real controversies and determines rights actually controverted, and does not address or dispose of abstract questions or issues that might arise in a hypothetical or fictitious situation or setting. *Galyen v. Balka*, 253 Neb. 270, 570 N.W.2d 519 (1997). Thus, a court should refuse a declaratory judgment unless the pleadings present a justiciable controversy which is ripe for judicial determination. *Boettcher v. Balka*, 252 Neb. 547, 567 N.W.2d 95 (1997).

In *Galyen*, taxpayers filed a declaratory judgment action against the State Tax Commissioner, seeking a judicial determination that the manner of taxing center-pivot irrigation systems and real property on which they were situated was unlawful. We noted that the case or controversy requirement applies with equal, if not stronger, force to an action for declaratory judgment, since the right to maintain the action is expressly granted only to those persons whose rights, status, or other legal relations are affected by a statute. In *Galyen*, the appellants' claim for relief was entirely dependent upon future events, e.g., whether the State Tax Commissioner would issue new regulations regarding taxation of center-pivot irrigation systems. The

appellants conceded that the requested declaratory relief could not have affected any right or interest existing at the time the matter was submitted to the district court. Therefore, we concluded that the appellants had presented no actual controversy capable of judicial resolution.

Here, DEQ and DHHS advised USE that they viewed the fill and mitigation project as commencement of construction without a license and thus as grounds for denying USE's application. However, DEQ and DHHS had made no decision regarding the license application at the time this action for declaratory relief was commenced, nor had USE violated any DEQ or DHHS regulation at the time the judgment was entered by the district court. Therefore, whether DEQ and DHHS would deny USE's application for the LLRW site on the basis of its attempt to fill the D-3 wetland remained uncertain. Declaratory judgment cannot be used to decide the legal effect of a state of facts which are future, contingent, or uncertain. *Galyen v. Balka, supra.*

We conclude that the threat of denial of USE's application does not create an actual case in controversy. Thus, the district court lacked jurisdiction to exercise judicial power over this cause, and we, likewise, are without jurisdiction. In the absence of an actual case or controversy requiring judicial resolution, it is not the function of the courts to render a judgment that is merely advisory. See *Putnam v. Fortenberry*, 256 Neb. 266, 589 N.W.2d 838 (1999).

## CONCLUSION

The judgment of the district court is reversed, and the cause is remanded with directions to dismiss.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.