STATE OF NEBRASKA, APPELLEE, V.
JOHN DIXON, APPELLANT.
614 N.W. 2d 288

Filed July 14, 2000.    No. S-98-888.

Daniel P. Bracht, of Law Offices of Daniel P. Bracht, for appellant.

Don Stenberg, Attorney General, and Kimberly A. Klein for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

## INTRODUCTION

John Dixon was convicted pursuant to a jury verdict in the district court of attempted first degree murder, use of a deadly weapon to commit a felony, and attempted theft by unlawful taking of property with a value in excess of $1,500. The district court thereafter sentenced Dixon to a combined sentence of not less than 49 nor more than 62 years' imprisonment. Dixon timely appealed. The primary issue in this appeal is whether the evidence adduced at trial was sufficient to entitle Dixon to a jury instruction on attempted second degree murder. Based on our holding in *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997), we answer this question in the affirmative, and for the reasons stated herein, we affirm Dixon's conviction for attempted theft by unlawful taking, reverse Dixon's convictions for attempted first degree murder and use of a deadly weapon to commit a felony, and remand this cause for a new trial on those two counts.

## FACTUAL BACKGROUND

The evidence viewed in a light most favorable to the State reveals that on the evening of February 7, 1995, Chad Vasa, Ramon Morales, and Dixon met at an apartment in Omaha, Nebraska. When Vasa first met Morales, Morales was carrying a duffelbag containing a sawed-off shotgun and some shells for the shotgun. Dixon arrived after Morales. Shortly thereafter, Vasa, Morales, and Dixon (hereinafter collectively the trio) decided to leave the apartment and abandon the duffelbag containing the shotgun at the house of a mutual acquaintance; the trio then drove to western Omaha in search of a car to steal.

The initial attempt to steal a car went awry, as Morales and Dixon were chased away from the car by someone appearing to

have a weapon. The trio decided that before they attempted to steal another car, they would retrieve the shotgun and shells. After doing so, they set out toward West Point, Nebraska. The trio stopped in Decatur, Nebraska, where they stole another car, a Chevrolet Celebrity, and then again in Oakland, Nebraska, where Dixon used the shotgun to shoot the windows out of a parked car, before they finally arrived in West Point.

Upon arriving in West Point early on the morning of February 8, 1995, the trio decided to attempt to steal yet another car. They parked the Chevrolet Celebrity in an alley adjacent to the garage and behind the home of Bill and Cheryl Weiler. Vasa testified that he remained in the car while Morales and Dixon got out to steal the Weilers' 1985 Buick Electra Park Avenue automobile, which was parked next to the garage. According to Vasa, Morales let himself into the car while Dixon stood at the corner of the Weilers' garage, holding the shotgun.

Cheryl Weiler awoke when her dog began to bark at approximately 6:15 a.m. She went to the kitchen and attempted to quiet her dog by tapping on the window when she noticed that the interior light of the Park Avenue was on and that someone was behind the steering wheel. Cheryl Weiler also noticed that there was another person standing outside of her car between the car and the garage. She alerted her husband, Bill Weiler, and dialed the 911 emergency dispatch service on the telephone.

Bill Weiler then went to the door and ordered the intruders to get out of the car. There was a brief hesitation and a muffled response before one of the intruders asked, "Now?"; Bill Weiler then shouted, "Yeah, now." At this point, a shot was fired in Bill Weiler's direction, striking him with at least 180 shotgun pellets, causing him severe injuries. The remainder of the shotgun pellets struck the area of the Weilers' home near the doorway from which Bill Weiler had emerged. Before authorities arrived at the Weilers' home, the trio had escaped and were headed back toward Omaha.

Hours after the shooting, Vasa was arrested near Tekamah, Nebraska, for possessing a stolen vehicle. After his arrest, Vasa met with police several times and was questioned regarding the February 8, 1995, shooting in West Point. On February 21, Vasa gave a statement to Investigators Ron Hilliges and Doug Johnson

of the Nebraska State Patrol, in which Vasa indicated that he and Dixon were involved in the shooting. Vasa asserted that he was not the shooter and voluntarily took two polygraph examinations in an attempt to exonerate himself, failing both of them.

Hilliges and Johnson informed Vasa of the polygraph results and told Vasa that they did not believe his story. Still maintaining his innocence, Vasa offered to make a tape-recorded telephone call to Dixon, during which Vasa believed Dixon would admit to the shooting. Johnson and Hilliges explained that Vasa was to ask questions in a manner that would not allow Dixon to merely give "yes" or "no" answers and then allowed Vasa to place the call. During the ensuing telephone conversation, Vasa asked Dixon, "Wasn't you just supposed to scare him though, man?" Dixon replied, "Yeah." Later in the conversation, Vasa asked Dixon, "How come you shot him?" Dixon responded, "I don't know, dude. . . . I just felt like blasting on him." Dixon concluded their discussion by stating, "That's the point of having a gun." Hilliges and Johnson were present when the conversation between Vasa and Dixon was recorded.

Johnson and Hilliges later discovered that portions of the tape-recorded conversation were indiscernible because the voices sounded "like chipmunks." The investigators then approached Brian Kreikemeier, an experienced sound technician, to "clean up" the recording and make the conversation more intelligible. Kreikemeier "cleaned up" the recording by slowing the tape speed down, adjusting the frequency of the recorded sounds through an equalizer, and recording the slower version onto another tape. Kreikemeier testified at trial that no changes could have been made to the original tape because it was received by him in such a condition that it could not be recorded over.

Dixon was ultimately brought to trial on charges of attempted first degree murder, use of a deadly weapon in the commission of a felony, and attempted theft by unlawful taking. At trial, the State sought to introduce both the partially unintelligible tape recording (exhibit 4) and the "cleaned-up" version (exhibit 3), and both were admitted into evidence over Dixon's objections. Exhibit 3 was played in court and was then explained and corroborated by Vasa's testimony. Vasa, Johnson, and Hilliges all

testified that exhibit 3 was an accurate depiction of the conversation between Dixon and Vasa. Dixon's attorney then attempted to cross-examine Vasa about the failed polygraph examinations, but the State objected, and the objection was sustained.

Dixon also objected to the introduction of three photographs the State sought to admit into evidence. Two of these photographs (exhibits 22 and 23) depict Bill Weiler's injuries, and the third photograph (exhibit 44) illustrates the field of vision of Debra Harstick, a neighbor of the Weilers who testified at trial. Dixon argued that exhibits 22 and 23 were cumulative and would inflame the jury and that exhibit 44 should not be admitted because it was taken during a season different from that in which Bill Weiler was shot and depicts automobiles not present on the day of the shooting. The photographs were admitted into evidence over Dixon's objection.

At the conclusion of the State's case, Dixon made a motion to dismiss all three counts of the information, which motion was recharacterized by the court as a motion for a directed verdict and then overruled. Prior to the submission of the case to the jury, the district court instructed the jury on attempted murder in the first degree. Dixon did not request a jury instruction on attempted murder in the second degree, and no such instruction was given. After the case was submitted to the jury but before a verdict had been reached, the district court acceded to the jury's request for a tape player, "presumably to listen to Exhibit 3." Thereafter, the jury returned verdicts of guilty on all three counts.

Dixon made a motion for a new trial, which was overruled upon sentencing. After a presentence investigation, the district court sentenced Dixon to not less than 40 nor more than 50 years' imprisonment for the crime of attempted first degree murder, not less than 8 nor more than 10 years' imprisonment for the crime of using a firearm to commit a felony, and not less than 1 nor more than 2 years' imprisonment for the crime of attempted theft by unlawful taking. The district court ordered the sentences to be served consecutively. Dixon timely appealed.

## ASSIGNMENTS OF ERROR

Dixon contends, summarized and restated, that the district court erred in (1) failing to instruct the jury on the lesser-

included offense of attempted second degree murder; (2) admitting various audiotapes, photographs, and testimony into evidence; (3) allowing the jury to take an electronic tape recorder into their deliberations; (4) not allowing Dixon to cross-examine Vasa regarding the results of Vasa's polygraph examinations; (5) giving a jury instruction which improperly minimized the burden of proof on the element of intent; (6) declining to give a jury instruction tendered by Dixon on the inherent problems with verbal communications; (7) conducting an ex parte communication with the jury; (8) overruling Dixon's motions for a directed verdict and for a new trial; (9) finding sufficient evidence to uphold Dixon's convictions; and (10) imposing excessive sentences.

## STANDARD OF REVIEW

Whether jury instructions given by a trial court are correct is a question of law. *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). In an appeal based on a claim of erroneous jury instructions, the appellant has the burden to show that the questioned instructions were prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Brown*, 258 Neb. 346, 603 N.W.2d 456 (1999).

## ANALYSIS

### DUTY TO INSTRUCT JURY ON LESSER-INCLUDED OFFENSE

Dixon first contends that the district court erred by failing to instruct the jury that it could find him guilty of the lesser-included offense of attempted second degree murder. We must therefore determine whether the district court was correct in instructing the jury on only attempted first degree murder or whether the evidence also warrants an instruction on the lesser-included offense of attempted second degree murder, notwithstanding Dixon's failure to request such an instruction.

It is the duty of a trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not, and an instruction or instructions which by the omission of certain elements have the effect of withdrawing from the jury an essential issue or element in the case are prejudicially erroneous. *State v. Brown, supra*. Jury instructions must be read as a whole,

and if they fairly present the law so that the jury could not be misled, there is not prejudicial error. *Id.*

■ This court has delineated a two-step procedure for trial courts to follow when determining whether to instruct the jury on a lesser-included offense. See *State v. Williams*, 243 Neb. 959, 503 N.W.2d 561 (1993). In *State v. Williams*, 243 Neb. at 965, 503 N.W.2d at 566, we stated:

> [A] court must instruct on a lesser-included offense if (1) the elements of the lesser offense . . . are such that one cannot commit the greater offense without simultaneously committing the lesser offense and (2) the evidence produces a rational basis for acquitting the defendant of the greater offense and convicting the defendant of the lesser offense.

As charged in the present case, the statutory elements of attempted first degree murder are these: a substantial step in a course of conduct intended to culminate in the commission of a purposeful, malicious, premeditated killing of another person. Neb. Rev. Stat. §§ 28-201 and 28-303 (Reissue 1995). The statutory elements of attempted second degree murder are these: a substantial step in a course of conduct intended to culminate in the commission of an intentional killing of another person. § 28-201 and Neb. Rev. Stat. § 28-304 (Reissue 1995).

■ Applying the *Williams* test, we held in *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997), that attempted second degree murder is a lesser-included offense of attempted first degree murder. Having satisfied the initial inquiry of the *Williams* test, we now address the crucial question in this appeal as to whether the evidence in the instant case produces a rational basis for acquitting Dixon of attempted first degree murder and convicting him of the lesser-included offense of attempted second degree murder.

*State v. Al-Zubaidy, supra,* is instructive. In *State v. Al-Zubaidy*, we determined that the evidence warranted an instruction on the lesser-included offense of attempted second degree murder. The sole evidence upon which we based our conclusion was the defendant's statement that he did not intend to kill the victim upon entering her residence. We determined that the defendant's statement made it possible for the jury to find that

he went to the victim's home with no premeditation to kill, which entitled the defendant to a jury instruction on attempted second degree murder. Because the district court did not give such an instruction, we reversed Al-Zubaidy's conviction and remanded the cause for a new trial.

Similarly, the evidence in the instant case provides a rational basis upon which the jury could have acquitted Dixon of attempted first degree murder and convicted him of attempted second degree murder. Vasa's testimony conveys that the trio retrieved the shotgun for the purposes of protection and intimidation after the first attempt to steal a car had gone awry. The trio did not know they would again be confronted by the owner of a car they were attempting to steal, but considered it prudent to have the shotgun in case they were. Further, Dixon maintained that he was "just supposed to scare" anyone who might discover them. Consistent therewith, after Bill Weiler shouted, Dixon shot just one time from over 70 feet away after a short verbal exchange.

■ There is no doubt that a jury could reasonably infer from the foregoing evidence that Dixon possessed the requisite premeditation to be convicted of attempted first degree murder. The evidence, however, is also such that a jury could reasonably have drawn contrary inferences and concluded that Dixon did not possess the requisite premeditation for attempted first degree murder. Where the evidence and circumstances of a crime are such that different inferences may properly be drawn therefrom as to the degrees, it becomes the duty of the court to submit the different degrees to the jury for them to draw the inferences, whether requested to do so or not. *State v. Ellis*, 208 Neb. 379, 303 N.W.2d 741 (1981). The failure of the district court in this case to instruct the jury on attempted second degree murder precluded the jury from considering the lesser-included offense of attempted second degree murder, thereby creating the situation in which the jury had to either convict Dixon of attempted first degree murder or acquit him when the evidence at least supported an instruction on the lesser-included offense.

There is ample evidence in the instant case from which the jury could have drawn inferences that would potentially have led to a conviction for either attempted first degree murder or

attempted second degree murder, and the jury should have been allowed to consider the lesser-included offense of attempted second degree murder. See *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997). Because the evidence adduced at Dixon's trial warranted a jury instruction on attempted second degree murder, we conclude that the failure of the district court to so instruct constituted prejudicial error. It is the duty of the trial judge to instruct the jury on the pertinent law of the case, whether requested to do so or not. *Id.* Thus, Dixon's convictions for attempted first degree murder and the related count of use of a deadly weapon to commit a felony must be reversed, and this cause is remanded for a new trial on those two counts.

We do note that Dixon assigned as error that there was insufficient evidence to support his conviction for attempted theft by unlawful taking. Dixon, however, did not support this assigned error with any argument; errors that are assigned but not argued will not be addressed by this court. See *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000). Moreover, upon reviewing the record, we conclude that there is sufficient evidence beyond a reasonable doubt for a jury to convict Dixon of attempted theft by unlawful taking of property with a value in excess of $1,500.

### PROVISION OF AUDIOTAPE PLAYER TO JURY

Although the foregoing determinations resolve this appeal, we nonetheless consider one of the other issues that Dixon assigns as error because it is likely to recur as an issue during a retrial. An appellate court may, at its discretion, discuss issues unnecessary to the disposition of an appeal where those issues are likely to recur during further proceedings. *Gestring v. Mary Lanning Memorial Hosp., ante* p. 905, 613 N.W.2d 440 (2000).

Dixon asserts that the district court erred in admitting exhibits 3 and 4 of his recorded conversation with Vasa on February 21, 1995, because there was inadequate foundation to do so. Dixon also argues that there was insufficient foundation for exhibits 59 and 60, which are redacted copies of exhibits 3 and 4, respectively, that were submitted to the jury. Suffice it to say that if Dixon is retried and adequate foundation is elicited

at that trial, tape recordings of relevant and material conversations may properly be admitted into evidence. See, *State v. Pearson*, 215 Neb. 339, 338 N.W.2d 445 (1983); *State v. Loveless*, 209 Neb. 583, 308 N.W.2d 842 (1981); *State v. Myers*, 190 Neb. 146, 206 N.W.2d 851 (1973). The tape recordings were critical items of evidence and are likely to be offered when Dixon is retried; we therefore proceed to address the procedure by which such exhibits should be presented to the jury if properly admitted into evidence.

Five minutes after the jury retired to deliberate in the instant case, the jury requested that the trial judge provide it with an audiotape playback machine. The trial judge, in open court outside of the presence of the jury, advised Dixon and counsel for both parties that "I've received a request from the jury for a recorder or player and speaker, which is presumably to listen to Exhibit 3." We digress to note that the record reflects that exhibit 3 (later redacted and submitted to the jury as exhibit 59) was played in open court at trial and that immediately after it was played, Vasa testified again regarding portions of the conversation, including Dixon's statement, "I just felt like blasting on [the victim]." While testifying at trial, Vasa was reading from a transcript of the very same conversation contained in exhibit 3. This procedure was allowed at trial because there were places on the tape recording where the conversational exchange was very quick and the conversation between Dixon and Vasa was difficult to understand when heard only once.

Dixon objected to the jury's request for the audiotape playback machine; his objection was overruled, and the jury was provided a tape player and exhibits 59 and 60 for unsupervised use in the jury room. Dixon contends on appeal that by letting the jury hear and rehear exhibits 59 and 60, the court allowed the jury to place undue emphasis on a small portion of the evidence adduced at trial. The precise question to be answered in this appeal is whether the district court erred in the procedure it utilized before the court in allowing the jury to rehear portions of exhibits 59 and 60 during deliberations.

The general rule is that allowing a jury to rehear only portions of the evidence after they have commenced deliberations is not to be encouraged, but it is a matter within the discretion of the

trial court. *State v. Halsey*, 232 Neb. 658, 441 N.W.2d 877 (1989). Although trial courts have been given latitude in deciding whether to allow a jury to reexamine exhibits such as audiotapes, we think that it would be instructive to review the principles that we utilize in reviewing whether such reexamination constitutes an abuse of discretion. The traditional common-law rule is that a trial court has "no discretion to submit depositions and other testimonial materials to the jury room for *unsupervised review*, even if properly admitted into evidence at trial." (Emphasis supplied.) *Chambers v. State*, 726 P.2d 1269, 1275 (Wyo. 1986).

Thus, previously played portions of tape recordings, like testimony of an actual witness at trial, generally should not be reheard by jurors. See *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998). Jurors must rely upon their memory of what they heard the witness say, be it from a live witness or a tape recording. *Id.* The common-law rule is designed to curtail the principal danger involved in allowing the jury to rehear only a part of the evidence; that is, the jury may give undue emphasis to the part of the evidence which is reheard. *State v. Halsey, supra.*

We do not ordinarily stray from the common-law rule, i.e., a trial court should not allow unrestricted review of previously played portions of tape recordings, any more than a court would allow unrestricted rereading of the testimony of an actual witness at trial. *State v. Jacob, supra.* When a jury makes a request to rehear certain evidence, the common-law rule requires that a trial court discover the exact nature of the jury's difficulty, isolate the precise testimony which can solve it, and weigh the probative value of the testimony against the danger of undue emphasis. If, after this careful exercise of discretion, the court decides to allow some repetition of the tape-recorded evidence for the jury, it can do so in open court in the presence of the parties or their counsel or under other strictly controlled procedures of which the parties have been notified. *Chambers v. State, supra.*

Accordingly, once a tape recording is properly admitted as testimonial evidence, such evidence should be marked as any other exhibit and included in the record for review in the event of an appeal. After being admitted, however, the exhibit should be played once in open court so that the jury can hear the tape

in the same manner that it does other evidence. See, *State v. Myers*, 190 Neb. 146, 206 N.W.2d 851 (1973); 75B Am. Jur. 2d *Trial* § 1689 (1992 & Cum. Supp. 2000). It is only under circumstances where the jury makes a request to rehear certain evidence during deliberations that the trial court must proceed to weigh the probative value of the evidence against the danger of undue emphasis, in open court in the presence of both parties or their counsel, before determining whether portions of the evidence should be reheard by the jury.

Applying these established principles, we conclude that the district court erred in not conducting an examination into the reasons for the jury's request to rehear portions of exhibit 59 or 60 and in not weighing the probative value of the requested evidence against the danger of undue emphasis before the court granted the jury's request to rehear certain evidence. Moreover, the district court erred in submitting exhibits 59 and 60 to the jury for unsupervised and unrestricted review within the confines of the jury room, under any circumstances. In reaching these conclusions, we do not share the dissent's view that the playing of Dixon's tape-recorded statements and Vasa's subsequent reading from a verbatim transcript of the tape recording at trial were akin to playing at trial a tape recording of an actual crime in progress. See, e.g., *State v. Myers, supra.* We express no opinion as to whether any portion of exhibits 59 or 60 should have been reheard by the jury because the record does not reflect the reasons for the jury's request. This court, however, has observed on many other occasions that such a practice is " 'fraught with some danger to a fair trial, and ought to be indulged in with caution.' " *State v. Halsey,* 232 Neb. 658, 663, 441 N.W.2d 877, 881 (1989) (quoting *Barton v. Shull,* 70 Neb. 324, 97 N.W. 292 (1903)).

For the sake of completeness, we note that the evidence contained in exhibits 59 and 60 does not pertain to the attempted theft by unlawful taking conviction, and our affirmance of that count remains intact. We do not consider any other errors assigned by Dixon in this appeal.

## CONCLUSION

We conclude, in accord with *State v. Al-Zubaidy*, 253 Neb. 357, 570 N.W.2d 713 (1997), that Dixon was entitled to a jury

instruction on the lesser-included offense of attempted second degree murder and that the failure of the district court to so instruct constituted prejudicial error. Dixon's assignment of error relating to the conviction for attempted theft by unlawful taking of property is without merit. Accordingly, we affirm Dixon's conviction for attempted theft by unlawful taking, reverse Dixon's conviction for attempted first degree murder and the related conviction for use of a deadly weapon to commit a felony, and remand this cause to the district court for a new trial on those two counts.

AFFIRMED IN PART, AND IN PART REVERSED
AND REMANDED FOR A NEW TRIAL.

STEPHAN, J., concurring in part, and in part dissenting.

I agree with and concur in that portion of the majority opinion which holds that Dixon's convictions for attempted first degree murder and the related count of use of a deadly weapon to commit a felony should be reversed and the cause remanded for a new trial on those counts because the trial court erred in not instructing on the offense of attempted second degree murder. I also concur in the affirmance of Dixon's conviction of attempted theft by unlawful taking of property with a value in excess of $1,500. However, I respectfully dissent from that portion of the majority opinion under the subheading "Provision of Audiotape Player to Jury." I do so for two reasons.

First, I do not regard the issue as properly before us under accepted principles of appellate review. We generally adhere to the rule that an appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *In re Interest of Battiato, ante* p. 829, 613 N.W.2d 12 (2000); *Springer v. Bohling, ante* p. 71, 607 N.W.2d 836 (2000). I acknowledge our discretionary power to depart from this rule in order to resolve issues which are unnecessary to the disposition of an appeal but are likely to recur during further proceedings. See *Snyder v. Contemporary Obstetrics & Gyn.,* 258 Neb. 643, 605 N.W.2d 782 (2000). However, I disagree with the majority's invocation of this power as the basis for discussing the issue of when an audiotape player may be provided to a jury for the purpose of listening to tape-recorded evidence. This issue cannot recur on retrial of this case unless the

State offers sufficient foundation to establish the admissibility of the tape recordings. The issue of foundational sufficiency for this evidence in the first trial was assigned as error in this appeal but not discussed in the majority opinion. If it is unnecessary to reach the issue of whether the tapes are admissible, I cannot discern a reason for addressing the question of how they should be published to the jury. Even if we assume that on retrial the State will offer the tapes and that the district court will correctly determine that foundation is sufficient to establish admissibility, it is entirely speculative as to whether the jury on retrial will request playback equipment for the purpose of listening to the tape recordings during its deliberations. Thus, it seems to me that this cannot be accurately characterized as an issue likely to recur during further proceedings and that reaching it in this appeal amounts to issuing an advisory opinion, which is not our proper function. See *US Ecology v. State*, 258 Neb. 10, 601 N.W.2d 775 (1999).

Second, assuming for the sake of argument that the issue is properly before us, I disagree with its resolution on the merits. The majority cites *Chambers v. State*, 726 P.2d 1269, 1275 (Wyo. 1986), for the "traditional common law rule" that a trial court has "no discretion to submit depositions and other testimonial materials to the jury room for unsupervised review, even if properly admitted into evidence at trial." However, the *Chambers* court also noted that a trial court "has broad discretion in deciding whether to submit *non-testimonial* exhibits, such as non-testimonial writings, audiotapes, or videotapes, to the jury during its deliberations." (Emphasis in original.) *Id.* Although the majority apparently regards the tape-recorded conversations between Dixon and Vasa as testimonial in nature, I do not. To "testify" is "[t]o give evidence as a witness." Black's Law Dictionary 1485 (7th ed. 1999). Dixon certainly was not giving evidence as a witness during his taped telephone conversation with Vasa. Rather, he was engaging in what he probably believed to be a private conversation with a person who, unbeknown to him, had admitted his own involvement in the crimes for which Dixon was eventually charged and was cooperating with law enforcement authorities. Dixon's statements to Vasa were certainly incriminating, but they were not testimonial in nature.

The majority cites *State v. Jacob*, 253 Neb. 950, 574 N.W.2d 117 (1998), in support of its statement that "previously played portions of tape recordings, like testimony of an actual witness at trial, generally should not be reheard by jurors." In that case, the tape recording at issue was a taped statement given by a crime scene witness to police which the defendant had introduced and played in order to impeach the witness during his trial testimony. In *State v. Halsey*, 232 Neb. 658, 441 N.W.2d 877 (1989), also relied upon by the majority, we held that the trial court did not err in refusing to allow the jury to listen to tape-recorded testimony of certain trial witnesses during its deliberations because of the danger that undue emphasis would be placed upon that part of the evidence if reheard. Both *Jacob* and *Halsey* involved tape recordings of testimony, or matters utilized during testimony, of nonparty witnesses. I do not read these cases as supporting a proposition that a jury generally should not be permitted to rehear a properly admitted tape recording of nontestimonial incriminating statements made by a defendant in a criminal proceeding.

Assuming their admissibility, Dixon's tape-recorded statements to Vasa were not testimonial in nature, but, rather, constituted substantive evidence of his guilt, much like a tape recording of a crime in progress. Most jurisdictions permit trial judges broad discretion in allowing the jury to have unlimited access to evidence of this nature after it has been properly received. See, e.g., *U.S. v. Puerta Restrepo*, 814 F.2d 1236 (7th Cir. 1987) (finding no error in permitting jury to have transcripts of tape-recorded conversations in which defendant made incriminating statements to police informant); *State v. Castellanos*, 132 Wash. 2d 94, 935 P.2d 1353 (1997) (finding no error in allowing jury unlimited access to audiotapes of a drug buy and a playback machine during deliberations); *Pino v. State*, 849 P.2d 716 (Wyo. 1993) (finding no error in allowing jury to have tape recording of drug transaction and playback machine during deliberations); *State v. Halvorson*, 346 N.W.2d 704 (N.D. 1984) (holding tape recordings of conversations between defendant, his mother, and law enforcement officers were properly received in evidence and submitted to jury with playback equipment); *State v. Barbo*, 339 N.W.2d 905 (Minn. 1983) (finding trial court

did not err in permitting jury to have tapes and typewritten transcript of conversation between defendant and person cooperating with police during which defendant made incriminating statements).

If the tape recordings of Dixon's telephone conversations with Vasa were properly received in evidence, an issue which neither the majority nor I decide, I would hold that the trial court had broad discretion in deciding whether to submit the tapes and playback equipment to the jury for unrestricted review during its deliberations, and I would conclude that it did not abuse its discretion in doing so.