STATE OF NEBRASKA, APPELLEE, V.
LINH BAO, APPELLANT.
640 N.W.2d 405

Filed March 15, 2002.   No. S-01-282.

440

Dennis R. Keefe, Lancaster County Public Defender, and Robert G. Hays for appellant.

Don Stenberg, Attorney General, and Marilyn B. Hutchinson for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellant, Linh Bao, was convicted of first degree murder and use of a weapon to commit a felony. On appeal, he claims the trial court erred in giving or refusing to give certain jury instructions, allowing the reading of a portion of a witness' testimony, and allowing a juror to be separated from the jury and then return to deliberate. He also contends that there was insufficient evidence to convict him of first degree murder. We affirm.

## BACKGROUND

Bao was charged by information with count I, first degree murder, and count II, use of a weapon to commit a felony. The victim, Vu Hoang La (Vu La) was shot while sitting in the driver's seat of a red car.

The record shows that on February 5, 2000, Bao attended a party. According to Bao, he became involved in an altercation and the host and hostess of the party drove him home in their sports utility vehicle (SUV). Three men who were also at the party followed them in a red car.

According to a statement Bao gave to the police, at least two of the men in the car following him, Vu La and Quynh Le, had tried to make trouble at the party. When Bao arrived home, he was "scared to death." He went inside, retrieved an unloaded gun, and went back outside. The record shows that a struggle occurred between Bao, Vu La, and possibly Quynh Le. During this confrontation, Bao was accused of trying to scare them with

a fake gun. Bao told the police that both Vu La and Quynh Le beat him up and that he was very frightened. He told the police that he got up, ran into his home, loaded the gun, and went back outside. Bao stated that when he came out again, Vu La was in the driver's seat of the red car and Quynh Le was standing "at the car," with the car door closed. Bao told the police that Quynh Le began walking toward him, that Bao shot the gun "into the sky," and that Quynh Le ran away. At times during the interview, Bao stated that Quynh Le tried to grab him or the gun. At other times, however, he stated that Quynh Le was farther away from him and did not touch him. Regardless, he maintained that he fired the gun in the air to scare Quynh Le away.

Bao told police that he knew he fired one shot and maybe two, but did not remember firing any additional shots. He stated that he did not know if he shot Vu La or not, but that a couple of minutes after he fired the shots, he saw that Vu La was "sit[ting] still." When asked if he had pointed the gun at Vu La, Bao stated, "I think so. I don't know." Later, however, Bao insisted that he did not remember shooting at the car and that he shot the gun toward the sky.

Hanh Nguyen, who, with her husband, Dang Nguyen, had driven Bao home, testified that she saw Vu La wrestle Bao to the ground and that she saw Bao holding a black object. She testified that she told Vu La and Quynh Le to go home. She saw Vu La walk around the red car, but did not see him get inside. She testified that Quynh Le had already started walking home, that she drove her SUV over by him and told him to get in, and that she then heard two gunshots. Quynh Le also testified that he had started to walk home and that as he was walking, he heard gunshots. Quynh Le's testimony indicated that he did not get into either the Nguyens' SUV or the red car. The record indicates that Dang Nguyen was outside the SUV when Vu La wrestled Bao to the ground, but that Dang Nguyen then got back in the SUV and did not get out again.

Bao's wife testified that on February 5, 2000, Bao arrived home and was mumbling to himself, "Do you want to kill me?" She testified that Bao took something from the closet where his gun was kept and went back outside. She followed him outside, carrying their baby. Bao's wife testified that she saw two people

hit Bao and try to take a gun from him. At some point, she took the gun from Bao. She testified that Bao took a few steps backward, then took the gun away from her and ran back inside their residence. She stated that one of the men tried to follow Bao, but the other man stated that they should go home. She told the men that the gun was real and that they should go home. She then went back inside. She testified that inside the residence, Bao looked angry and was walking back and forth asking, "Where is my bullet?" She saw him "do something" to the gun and then go back outside. She then heard two or three gunshots. She testified that Bao then returned to the residence and said, "I shot him. I shot him," and, apparently referring to Vu La, yelled, "Do you want to kill me? I already shot you."

Bao's neighbor, John M. Brooks, Jr., testified that on February 5, 2000, he heard noises outside his residence and looked out his window to see what was happening. Brooks testified that he saw Bao and a man fighting over something and another man possibly trying to break up the fight. Brooks saw the fight break up and saw one of the men hand something to a woman with a baby. He then saw Bao stand, back up, and then run forward again and take the object. He testified that Bao then ran toward his residence with the object. He testified that the people outside then attempted to get Vu La back into his car while Vu La kept yelling toward Bao's residence. Brooks stated that Vu La and a person he described as "the younger Asian male" got into Vu La's car and that a woman and a man got into the SUV. The SUV drove to the north, turned around, and then proceeded south down the street.

Brooks testified that he saw the red car pull onto the street and stop. He then saw the backup lights come on, and he thought the red car was going to turn around and follow the SUV. Brooks testified that at that time, he heard a gunshot. He stated that he saw Bao running toward the car, firing the gun. According to Brooks, Bao was holding the gun straight out in front of him when he was shooting. Brooks heard a total of three or four gunshots. He testified that the first shot appeared to shatter the passenger-side window and that the other shots were going into the car. Brooks called the 911 emergency dispatch service, and the police and emergency personnel arrived and found Vu La dead in the

driver's seat. Police officers found four shell casings in the vicinity of the car. A physician who performed an autopsy on Vu La determined that he had died as a result of a gunshot wound and that the manner of death was homicide.

At the end of the State's case, Bao moved to dismiss and moved for a directed verdict. The motions were overruled, and Bao did not submit any evidence. At the instruction conference, Bao requested an instruction stating that manslaughter upon a sudden quarrel is an intentional act. He also requested an instruction defining a sudden quarrel as "a legally recognized and sufficient provocation which causes a reasonable person to lose normal self control." Bao also objected to various instructions regarding manslaughter, including an instruction that the jury could find him guilty of use of a weapon to commit manslaughter. In addition, Bao requested an instruction that the crime of use of a weapon to commit the felony of first degree murder requires proof beyond a reasonable doubt that the actor used a deadly weapon for the purpose of causing the death, and not with merely the result of causing the death. The instruction was refused.

The jury was given an instruction, labeled "Effect of Findings," which stated in part:

You must separately consider in the following order the crimes of first degree murder, second degree murder and manslaughter. For first degree murder, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find Mr. Bao guilty of first degree murder and proceed to Count II. If you find the State did not so prove, then you must proceed to consider the crime of second degree murder.

For second degree murder, you must decide whether the State proved each element beyond a reasonable doubt. If the State did so prove each element, then you must find Mr. Bao guilty of second degree murder and proceed to Count II. If you find the State did not so prove, then you must proceed to consider the crime of manslaughter.

After the case was submitted to the jury, the jury requested a transcription of Brooks' testimony. After discussing our decision in *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000), the

court responded that the jury could not have a transcription of the testimony but that "[i]f there are particular areas of conflict or difficulty among the jurors, you may specify any such area and I will consider a specific request." Later in the day, the jury sent the following question: "We have a conflict as to where Quynh Le was at the time shots were fired. Can we have testimony given by John Brooks as an eyewitness as to who was around the red car when shots are fired?" After consultation with counsel, the court sent the jury a question which read: "Is there a disagreement among the jurors as to what John Brooks said regarding who was around the red car at the time shots were being fired? Please answer yes or no." The jury responded, "Yes."

The court examined the transcription of Brooks' testimony and marked the portions that addressed the question and proposed reading those portions to the jury. Bao objected on the basis that Brooks' testimony did not directly answer the question posed by the jury and that any reading of the testimony would unduly emphasize Brooks' testimony over that of other witnesses. The court stated that the issue the jury asked about was critical to the case and was argued fairly extensively by counsel during closing arguments. The court also stated, however, that neither the State nor Bao referred to Brooks' testimony on the issue in closing arguments. The court then stated that it would read the testimony. The parties discussed the provision of an instruction to the jury about the testimony, and defense counsel suggested that anything told to the jury tended to emphasize that the testimony had been repeated. The court agreed and stated that no special instruction would be given. No objections were made. The court then read the following portion from Brooks' testimony to the jury:

Q. Now, you said that you recognized Mr. Bao when he stood up. He was one of the three individuals that was on the ground?

A. Yes.

. . . .

Q. What were the other two Asian males doing shortly after Mr. Bao ran east toward his trailer?

A. Uhm, the older gentleman that was there and the man who got shot, the rest of the people that were there were

trying to get him to get back into the car, there was a car there that he had drove over.

Q. Did you see where that car was at?

A. Yes, it was toward the back of our trailer.

Q. Had you noticed that for — or during this argument?

A. Ah, yes, I'd seen him there.

Q. Did you see what Mr. Bao's wife and child did?

A. Uhm, at that time I don't see them anymore so I don't know where they went. I'm not sure.

Q. You didn't see what direction they might have left?

A. Huh-uh.

Q. Is that a no?

A. Yes. I'm sorry. No.

Q. These individuals are pushing another person back towards the car; is that correct?

A. Yes.

Q. What happens then?

A. Uhm, the man who got shot is yelling back towards, towards the east, back towards Mr. Bao's trailer, in that direction. Uhm, he keeps yelling. They're trying to get him into the car. Finally after maybe five minutes he finally gets into the car.

Q. Do you see anybody else other than those individuals that are trying to get this person back into the car?

A. No.

Q. When you say he gets back into the car, which part of the car does he get into?

A. He gets into the driver side.

Q. When he gets into the driver's side of the car, what do the other people do?

A. Ah, the younger Asian male gets in on the passenger side and crawls into the back seat. Uhm, the older lady and the older man get into a sport utility vehicle that was parked in front of the other car.

Q. So at this point to your knowledge everybody is in the cars?

A. Yes.

. . . .

[Q]. After you see that red car pull forward, what happens then?

A. Ah, the sport utility drives by, his parking or backup lights coming on like he's about ready to back up to make a U-turn and possibly go down the street.

Q. The red car's back-up lights come on?

A. Yes. . . . At that time, ah, the brake lights come immediately back on, the car stops and that's when I hear the first shot.

After the testimony was read to the jury, Bao moved for a mistrial and the motion was overruled.

The jury was then sequestered. During deliberations, a juror fell, fractured her humerus, and was taken to the hospital. As a result, the juror was separated from the jury for more than 24 hours. The jury was told of the situation and was instructed not to deliberate, discuss, or form any opinions about the case without the injured juror present. When she returned from the hospital, the injured juror was questioned by the court. The juror stated that she felt she was able to continue as a juror. She stated that while she was away, a deputy was with her at all times. She did not discuss the case with anyone, did not go near any of the areas described by the testimony, and did not hear or read any reports about the case. She stated that she was in pain, but not severe pain. She stated that she was taking medication for pain, but that it did not affect her. She stated that she understood that she must have a clear mind during deliberations and would inform the court if she became unable to concentrate.

The juror was allowed to rejoin the others and continue deliberations. Bao moved for a mistrial, and the motion was overruled.

The jury found Bao guilty of first degree murder and use of a weapon to commit a felony.

## ASSIGNMENTS OF ERROR

Bao assigns, rephrased, that the district court erred in (1) failing to instruct the jury that manslaughter upon a sudden quarrel is an intentional act; (2) failing to instruct the jury on his proposed definition of a sudden quarrel; (3) instructing the jury that it could find him guilty of use of a weapon to commit second degree murder or manslaughter; (4) instructing the jury that Bao

could be found guilty of manslaughter by causing Vu La's death while in the commission of an unlawful act, without specifying the unlawful act; (5) failing to instruct the jury that use of a weapon to commit the felony of first degree murder requires proof that the actor used the weapon with the purpose of causing the death; (6) allowing Brooks' testimony to be read to the jury after the case was submitted; (7) overruling his motion for a mistrial based on separation of the jury; and (8) determining there was sufficient evidence to sustain the verdict.

## STANDARD OF REVIEW

When dispositive issues on appeal present questions of law, an appellate court has an obligation to reach an independent conclusion irrespective of the decision of the court below. *State v. Redmond*, 262 Neb. 411, 631 N.W.2d 501 (2001).

The decision to grant a motion for mistrial is within the discretion of the trial court and will be upheld on appeal absent a showing of abuse of discretion. *State v. McLemore*, 261 Neb. 452, 623 N.W.2d 315 (2001).

In a criminal case, a court can direct a verdict only when there is a complete failure of evidence to establish an essential element of the crime charged or the evidence is so doubtful in character, lacking probative value, that a finding of guilt based on such evidence cannot be sustained. *State v. Johnson*, 261 Neb. 1001, 627 N.W.2d 753 (2001).

In a criminal case, a motion for new trial is addressed to the discretion of the trial court, and unless an abuse of discretion is shown, the trial court's determination will not be disturbed. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002).

## ANALYSIS

### ASSIGNMENTS OF ERROR CONCERNING MANSLAUGHTER AND SECOND DEGREE MURDER

Bao assigns that the district court erred in the manner in which it instructed the jury on manslaughter and second degree murder. Whether jury instructions given by a trial court are correct is a question of law. *State v. Thomas, supra.* To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that

(1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *State v. Thomas, supra.* Likewise, in an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *Nebraska Nutrients v. Shepherd,* 261 Neb. 723, 626 N.W.2d 472 (2001). Before an error in the giving of instructions can be considered as a ground for reversal of a conviction, it must be considered prejudicial to the rights of the defendant. *State v. Derry,* 248 Neb. 260, 534 N.W.2d 302 (1995).

Here, the court properly administered a step instruction in which the jury was instructed to consider only the crimes of second degree murder and manslaughter if the jury first found that the State failed to prove that Bao was guilty of first degree murder. In *State v. Derry, supra,* we examined similar circumstances and noted that we will presume that the jury followed the court's instruction and did not consider any of the purported lesser-included offenses after the defendant was found guilty of the primary charge against him.

The jury found Bao guilty of first degree murder. Under the step instruction administered by the district court, the jury never reached the question whether he committed the crimes of second degree murder and manslaughter. Assuming the court erred in the manner in which the jury was instructed, an issue we do not decide, Bao could not have been prejudiced because the jury did not reach the issues of second degree murder and manslaughter. See *State v. Derry, supra.* Accordingly, we determine that all of Bao's assignments of error relating to manslaughter and second degree murder are without merit.

## USE OF WEAPON INSTRUCTION

Bao argues he was entitled to an instruction that use of a weapon to commit the felony of first degree murder requires proof that the actor used the weapon with the purpose of causing the death of another person and not merely with the result of causing the death of that person.

Neb. Rev. Stat. § 28-1205(1) (Reissue 1995) provides:

Any person who uses a firearm, a knife, brass or iron knuckles, or any other deadly weapon to commit any felony which may be prosecuted in a court of this state or who unlawfully possesses a firearm, a knife, brass or iron knuckles, or any other deadly weapon during the commission of any felony which may be prosecuted in a court of this state commits the offense of using a deadly weapon to commit a felony.

■ In *State v. Ring*, 233 Neb. 720, 447 N.W.2d 908 (1989), the appellant was convicted of felony motor vehicle homicide and using a motor vehicle as a weapon to commit a felony. After an examination of § 28-1205, we held that a person could not be convicted of use of a weapon to commit an unintentional crime. We then stated that in order to convict the appellant of use of a weapon to commit a felony, the State was required to prove beyond a reasonable doubt that he used his vehicle for the purpose of committing a felony. See, also, *State v. Pruett, ante* p. 99, 638 N.W.2d 809 (2002) (discussing *State v. Ring, supra*).

Here, Bao was convicted of use of a weapon to commit the felony of first degree murder, which is an intentional crime. The jury was instructed that to find Bao guilty of first degree murder, the State must prove beyond a reasonable doubt that Bao killed Vu La and that he did so purposely, with deliberate malice, and with premeditated malice. Thus, by finding Bao guilty of both first degree murder and use of a weapon to commit a felony, the jury necessarily found that Bao used the gun for the purpose of committing the felony. Any additional instruction regarding the purpose for which a weapon is used is unnecessary when the felony which serves as the basis for the use of a weapon charge is an intentional crime. Accordingly, we determine that this assignment of error lacks merit.

### READING BROOKS' TESTIMONY TO JURY

Bao contends that he should have been granted a mistrial because Brooks' testimony was read to the jury. He argues that the testimony that was read to the jury did not precisely answer the jury's question. He argues that the probative value of testimony was outweighed by the danger of undue emphasis the reading placed on the testimony.

We have stated on several occasions that allowing a jury to rehear only portions of the evidence after the jury has commenced deliberations is not to be encouraged, but is a matter within the discretion of the trial court. *State v. Dixon*, 259 Neb. 976, 614 N.W.2d 288 (2000). See *State v. Gutierrez*, 260 Neb. 1008, 620 N.W.2d 738 (2001). When a jury makes a request to rehear certain evidence, under the common-law rule, the trial court must discover the exact nature of the jury's difficulty, isolate the precise testimony which can solve it, and weigh the probative value of the testimony against the danger of undue emphasis. *State v. Gutierrez, supra; State v. Dixon, supra.* If, after this careful exercise of discretion, the court decides to allow some repetition of the evidence, it can do so in open court in the presence of the parties or their counsel or under strictly controlled procedures of which the parties have been notified. See *State v. Dixon, supra.*

Here, when the jury asked for a transcription of Brooks' testimony, the court refused to provide the jury with a transcript and sought to determine the exact nature of any difficulty. When the jury made it clear that the jury disagreed over what Brooks said about who was around the red car, the court reviewed the testimony and isolated those portions that best addressed the area of the jury's concern. After considering the probative value of the testimony to the case, the court then decided to read only those limited portions of the testimony to the jury. The testimony was read in open court and in the presence of Bao and his attorneys. The reading of the testimony did not precisely answer the jury's question and may have emphasized a limited portion of Brooks' testimony. The district court, however, followed the correct procedure and limited the reading of testimony to the narrow issue inquired by the jury. Under these circumstances, the court did not abuse its discretion in choosing to read portions of testimony to the jury. Likewise, the court did not abuse its discretion in denying Bao's motion for a mistrial.

### SEPARATION OF JURY

Bao contends that the court should have declared a mistrial due to the separation of members of the jury upon one juror's hospitalization. Neb. Rev. Stat. § 29-2022 (Reissue 1995) provides:

When a case is finally submitted to the jury, they must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court. . . . If the jury are permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with or suffer themselves to be addressed by any other person on the subject of the trial, nor to listen to any conversation on the subject; and it is their duty not to form or express an opinion thereon until the cause is finally submitted to them.

We have held that under § 29-2022, after submission of a criminal case to the jury, the defendant has the right to have the jury kept together until the jury agrees upon a verdict or is discharged by the court. *State v. Robbins*, 205 Neb. 226, 287 N.W.2d 55 (1980). We have also stated that this right may be waived only by specific agreement or consent of counsel for the parties. *Id.*

In the absence of express agreement or consent by the defendant, a failure to comply with § 29-2022 by permitting the jurors to separate after submission of the case is erroneous, creates a rebuttable presumption of prejudice, and places the burden upon the prosecution to show that no injury resulted. *Id.* In *Robbins*, we explained that § 29-2022 is intended to prevent improper contacts or communication with or by the jurors after submission of a criminal case. Consequently, the issue is whether there was improper contact or communication with or by the jurors during separation which resulted in prejudice to the defendant. *Id.*

Here, when the injured juror was hospitalized, the remainder of the jury was kept sequestered and was instructed not to deliberate, discuss, or form any opinions about the case. When the injured juror returned, the court, without objection from the parties, questioned the juror regarding whether she had any contacts or communications with people outside of the jury about the case. The juror answered that she did not. The juror further indicated her ability to continue deliberating despite her injury. Under these circumstances, we conclude that the presumption of prejudice has been rebutted. Accordingly, we conclude that the court did not abuse its discretion in overruling Bao's motion for a mistrial.

### SUFFICIENCY OF EVIDENCE

Bao next contends that there was insufficient evidence to convict him of first degree murder. Bao argues that the evidence was not sufficient to allow a jury to find that he formed the intent to kill Vu La and then deliberated on that idea before executing it. Rather, Bao argues that he was frightened and in a state of panic when he fired the shots that killed Vu La.

When reviewing a criminal conviction for sufficiency of the evidence to sustain the conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Redmond*, 262 Neb. 411, 631 N.W.2d 501 (2001).

There was evidence that Bao left the scene of the struggle with Vu La, returned to his residence to get ammunition for his gun, loaded the gun, and then returned outside, where he then fired shots. When Bao was in his residence, his wife noted that he looked angry and testified that he was walking back and forth asking, "Where is my bullet?" Although there was evidence that Bao was afraid of Vu La and Quynh Le and that Quynh Le may have been approaching Bao at the time the shots were fired, there was evidence to the contrary. Other evidence showed that when Bao returned outside, Vu La was in his red car and Quynh Le was either in a vehicle or walking away. Further, there was evidence that Bao did not shoot toward the sky as he stated, but that he shot directly at Vu La's car while running toward it. Under these circumstances, there was sufficient evidence for the jury to conclude beyond a reasonable doubt that Bao formed the intent to kill and deliberated on that idea before executing it. We conclude that Bao's assignment of error on this issue is without merit.

### CONCLUSION

We conclude that Bao was not prejudiced by any error that might have occurred in the manner in which the jury was instructed relating to manslaughter or second degree murder. We further determine that the district court did not err in refusing his requested instruction regarding use of a weapon to commit the felony of first degree murder. We conclude that the court did not

abuse its discretion in reading a portion of testimony to the jury and in overruling Bao's motion for a mistrial based on separation of the jury. Finally, we determine that there was sufficient evidence to support Bao's conviction for first degree murder. We conclude that the court did not err in overruling Bao's motions to dismiss, for a mistrial, and for a new trial. Accordingly, we affirm.

AFFIRMED.