778 N.W.2d 473 (2010)
279 Neb. 453
STATE of Nebraska, appellee,
v.
Jacob C. FORD, appellant.
No. S-09-020.
Supreme Court of Nebraska.
February 19, 2010.
*476 James Martin Davis, of Davis Law Office, for appellant.
Jon Bruning, Attorney General, and George R. Love, Columbus, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
Jacob C. Ford was convicted by a jury of first degree sexual assault. The primary issue at trial was whether Ford's sexual intercourse with the alleged victim, C.H., was consensual. After he was sentenced to 4 to 6 years' imprisonment, Ford filed this timely appeal, arguing that the district court erred with respect to several evidentiary rulings it made during the trial.

I. BACKGROUND

1. FACTS
On December 27, 2007, C.H. attended a party at a house in southwest Lincoln where four male roommates resided. C.H., a 22-year-old college student at the time, was acquainted with the residents of the house and had previously attended parties there. She understood that the party was to be a celebration of Ford's return on leave from an overseas military deployment. Ford had lived at the residence prior to his deployment and was staying there at the time of the party. C.H. had previously met Ford at a going-away party for him prior to his deployment, but she had no contact with him while he was overseas.
C.H. arrived at the party at about 11:30 p.m. and began consuming various alcoholic beverages. Over the course of the next 3½ hours, she consumed five beers, two half-shots of rum, and a drink which included beer and hard liquor. There were approximately 15 people at the party when C.H. arrived, and everyone was drinking, *477 including Ford, who testified that he drank "anything and everything" until he became physically ill and that he then drank only beer.
C.H. was acquainted with Shaun H., one of the residents of the house, and had had a casual physical relationship with him several months previously. During the party, C.H. and Shaun talked and had physical contact. Sometime before 3 a.m., C.H. suggested to Shaun that they go downstairs to his bedroom, and he agreed. C.H. testified that at this point, she was intoxicated, so she stopped drinking. Once in Shaun's bedroom, the two engaged in consensual sexual intercourse for at least 30 minutes.
C.H. testified that she was drunk and tired and that she fell asleep after having intercourse with Shaun. She remembered him waking her and telling her he was going upstairs. Shaun testified that he did not think C.H. had fallen asleep and that he talked to her for about 15 minutes before leaving the bedroom and going upstairs at approximately 5:30 or 6 a.m. Shaun and one of his roommates then began making breakfast. At the time, Ford was sleeping in a room located on the main floor of the residence. About 15 minutes after Shaun came upstairs, Ford told Shaun and his roommate that they were being too loud and that he was going downstairs to sleep.
There is sharply conflicting testimony as to what occurred next. C.H. testified that after Shaun went upstairs, she again fell asleep. She later woke up in the dark and realized that someone was vaginally penetrating her. Approximately 15 seconds later, the person withdrew and then ejaculated on her stomach. C.H. did not fight or scream during the encounter. She testified that after the person withdrew, she said, "You're not Shaun," and that he responded, "I told you that five times." She testified that it was only then that she realized the person was Ford.
Ford's account of the event is markedly different. He testified that when he entered the lower level of the house, he observed someone lying on the couch so he went into Shaun's bedroom, which had been his bedroom when he had previously lived in the house. Ford had placed his belongings in this bedroom while he was staying at the residence during his leave. Ford testified that the television was on in the bedroom. After entering the bedroom, he took off his shirt and then lay on the bed. According to Ford, about 30 seconds later, he felt a hand on his chest and a woman started kissing his neck. When the woman sat up, he realized it was C.H. Ford testified that C.H. continued to kiss him and that she spoke seductively. Ford testified that they had consensual sexual intercourse, which ended when Ford became tired, withdrew, and ejaculated on her stomach. Ford testified that immediately after the encounter, he got dressed and talked briefly with C.H. Then, smelling food being prepared, Ford went upstairs to eat breakfast.
C.H. testified that after Ford went upstairs, she got up and got dressed. While dressing, she heard voices upstairs and heard Ford say, "`I told her that four or five times,'" and then she heard laughter. C.H. then tried without success to call her roommate, so she sent her roommate a text message from her cellular telephone. C.H. estimated that the text message was sent about 10 minutes after her encounter with Ford. Telephone records established that the text message was sent at 7:20 a.m.
Shaun testified that Ford came upstairs approximately 30 to 45 minutes after he announced that he was going downstairs to sleep. Ford testified that he sat down at the kitchen table with Shaun and one of his roommates and that they talked about *478 the events of the party. Ford stated that he had just had sex with C.H., and Shaun stated that he had had sex with her also. This was the first time Ford was aware of the sexual encounter between C.H. and Shaun. Ford told Shaun that C.H. had initiated the encounter. Shaun suggested that C.H. may have mistaken Ford for him, but Ford expressed doubt because of the difference in their height and weight, and Ford stated that he had clearly identified himself to C.H. The men laughed about this, and they suspected that C.H. overheard their laughter and conversation before she came upstairs and left the house.
C.H. went home and told her roommate that she had been assaulted by Ford. Her roommate called the police. C.H. drove to a hospital, where a forensic sexual assault examination was conducted by a nurse. Ford's DNA was found on C.H.'s abdomen, on the front panel of her underwear, and on her pubic area. A physician testified that he observed injuries to C.H.'s vaginal area. The injuries were consistent with nonconsensual sex, but also could have occurred during consensual sex.
On January 2, 2008, a police investigator instructed C.H. to place a recorded telephone call to Ford. The investigator was able to hear C.H.'s part of the conversation, but he could not completely hear Ford. C.H. knew the call was being recorded, but Ford did not. The investigator gave C.H. suggestions regarding the questions she should ask and the information she should obtain from Ford. During the call, C.H. stated that she wanted to talk to Ford about "what happened the other night.... [w]hat you did to me." Ford initially responded, "I didn't do anything." When C.H. continued to insist that he did, Ford stated, "[Y]ou climbed on top of me." When C.H. persisted, Ford eventually apologized but never expressly admitted that he had assaulted her.
During the trial, the district court made several evidentiary rulings which are the focus of the appeal. The court sustained the State's objections to Ford's attempt to elicit testimony concerning certain conduct and statements by C.H. It also sustained the State's objections and motions to strike certain testimony of several of Ford's character witnesses on the ground that the testimony was nonresponsive. The court permitted C.H. to testify as to the substance of the text message and received a photograph depicting the message over Ford's objection. And the district court permitted the State to question Ford regarding a consensual sexual relationship he had had with another woman which occurred after the charged offense. We will include additional facts with respect to these rulings in our discussion of each assignment of error.

2. VERDICT AND SENTENCE
At the conclusion of the 7-day trial, the jury found Ford guilty of first degree sexual assault. After he was sentenced to 4 to 6 years' imprisonment, Ford filed this timely appeal.

II. ASSIGNMENTS OF ERROR
Ford assigns, restated and renumbered, that the district court erred in (1) excluding evidence of C.H.'s sexual conduct and statements on the night of the party, (2) allowing the substance of and photographs of the text message into evidence, (3) continually sustaining the State's objections to the responsiveness of the answers of his character witnesses, and (4) allowing evidence of Ford's subsequent sexual relationship.

*479 III. STANDARD OF REVIEW
In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[1] The exercise of judicial discretion is implicit in determining the relevance of evidence, and a trial court's decision regarding relevance will not be reversed absent an abuse of discretion.[2]

IV. ANALYSIS

1. CONDUCT AND STATEMENTS OF C.H.

(a) Additional Background
Prior to trial, the State filed motions in limine to prevent Ford from presenting certain evidence at trial, including testimony regarding C.H.'s sexually related conduct and statements she made during the party and a photograph taken during the party which depicted C.H. and two other women making a sexually suggestive hand gesture. The State argued that this constituted evidence of C.H.'s prior sexual behavior, which was inadmissible under Nebraska's then-applicable rape shield statute, Neb.Rev.Stat. § 28-321 (Reissue 2008). Ford countered that the evidence constituted circumstances surrounding the charged offense, not prior sexual behavior, which was relevant to Ford's state of mind. The district court sustained the State's motions in limine and precluded Ford from offering the evidence.
During trial, Ford made an offer of proof relating to the testimony excluded by the court's ruling on the motions in limine. The offer was that if allowed to testify, one of the male residents of the house where the party was held would testify that "he has this strange relationship with [C.H.] where ... every time they see each other, she will grab his testicles; in return, he will grab her breasts. It's akind of a playful interchange between the two of them." The offer of proof did not include any representation that this conduct occurred at the party on December 27 and 28, 2007, or that Ford had ever witnessed it. In fact, the offer was that "if" Ford would have observed this exchange, it "could" have impacted Ford's later decisionmaking with respect to C.H. Ford further offered to prove that the same witness would testify that there was a conversation at the party where the witness asked C.H. if she would have sex with him, and C.H. said that she would if Shaun and the other roommate approved. The offer of proof did not indicate that Ford actually heard this conversation, only that "if" Ford knew of this conversation, it "could" have been a factor in his decisionmaking. The district court sustained the State's objections to the offer of proof and refused to allow the proffered testimony.
However, the court did receive in evidence the photograph of C.H. and two other women which had been the subject of one of the State's motions in limine. In response to the State's objection based upon the ruling on the motion in limine, Ford's counsel explained that he was offering the photograph to show that C.H. was flirting with Ford on the night of the party, but specifically said he was not going to talk about what the hand gesture meant. The court received the photograph to be admitted on this basis. Later, during his cross-examination, Ford testified without objection that he took the photograph and *480 that it depicted C.H. making a "sexual hand gesture," although he did not elaborate further and was not asked to do so.

(b) Disposition
Ford argues that the conduct and statements of C.H. directed to one of the male residents of the house should have been received under the three-part test articulated in State v. Sanchez-Lahora.[3] But that test corresponds to the provision of the rape shield statute which permits the court to receive evidence of the alleged victim's "past sexual behavior with the defendant when such evidence is offered by the defendant on the issue of whether the victim consented to the sexual behavior upon which the sexual assault is alleged."[4] The statute permits evidence of prior sexual behavior with persons other than the defendant only when offered by the defendant "upon the issue whether the defendant was or was not, with respect to the victim, the source of any physical evidence, including but not limited to, semen, injury, blood, saliva, and hair."[5] Ford did not offer the evidence in question for this purpose.
Ford also argues that even if the evidence was properly excluded under the rape shield statute, the exclusion violated his constitutional right to confront the witnesses against him. We have recognized that in limited circumstances, a defendant's constitutional right to confrontation can trump the rape shield statute.[6] But we need not analyze whether this case presents such a limited circumstance, because Ford did not assert a confrontation issue at trial. A constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal.[7]
For the sake of completeness, we find no merit to Ford's argument that the excluded evidence was probative of the "sexually-charged nature of the party" and that "C.H.'s own conduct could have reasonably led others, including [Ford], to believe that she was interested in sexual activity with multiple partners on the night in question."[8] Even if C.H. engaged in the sexually suggestive conduct or made the statements attributed to her on the night of the party, there was no showing that Ford saw or heard such statements or conduct. The offer of proof stated only that "if" Ford observed the conduct or heard the statements, it "could" have or "may" have affected his later determination as to whether C.H. had consented to sex. Because there was no showing that Ford actually did see or hear the conduct or statements, they could not be relevant, even under Ford's reasoning, to the issue of consent.
Finally, we note that the trial court reversed its ruling on the State's motion in limine and received the photograph, taken by Ford, which depicted C.H. and two other women making a hand gesture. In arguing for its admissibility, Ford's counsel stated that it was offered only to impeach the testimony of C.H. that she did not flirt with Ford at the party and that he did not intend to inquire into the meaning of the gesture. The record reflects that the photograph was ultimately received for *481 the purpose for which it was offered, and thus, the district court's preliminary ruling on the motion in limine could not constitute prejudicial error.

2. OBJECTIONS TO TESTIMONY AS NONRESPONSIVE

(a) Additional Background
During his case in chief, Ford called six witnesses to testify regarding his general reputation for peacefulness. During the direct examination of all but one of these witnesses, the State objected at various times, asserting that the witness' answer was "non-responsive" to the question asked and at times asking that the answer be stricken. The district court sustained each of these objections and motions to strike. All six witnesses ultimately testified to Ford's general reputation for peacefulness.

(b) Disposition
In Cardenas v. Peterson Bean Co.,[9] we held "the proper rule to be that counsel who is not conducting the questioning has no standing to ask that a nonresponsive answer be stricken upon the sole ground of lack of responsiveness," although we noted that "a voluntary statement by a witness, not responsive to a question, should be stricken." In Isham v. Birkel,[10] we stated that "[e]xcluding testimony during oral examination at a trial on the sole ground of nonresponsiveness raised by counsel who is not interrogating the witness is error." In State v. Swoopes,[11] we synthesized the holdings of Cardenas and Isham into the following rule:
One who wishes to object to an answer given by a witness to a question posed by opposing counsel may not object on the ground that the answer is not responsive, but must object on the ground that the answer is a voluntary statement or for some specific reason such as hearsay or a conclusion of the witness. Only the party asking the question can object on the ground that the answer is not responsive.[12]
When Ford's character witnesses were asked on direct examination whether they had formed an opinion regarding Ford's reputation for peacefulness, they initially responded by stating the substance of the opinion, instead of affirmatively stating that they had an opinion and waiting for another question eliciting its substance. The prosecutor objected and moved to strike on the sole ground that the answers were "non-responsive." Under the authorities discussed above, this was not a proper objection for the prosecutor, as the nonexamining attorney, to make, and the district court therefore erred in sustaining the objections and related motions to strike.

3. PHOTOGRAPH OF TEXT MESSAGE

(a) Additional Background
Prior to trial, Ford filed a motion in limine seeking to prevent the State from offering the content of the text message C.H. sent to her roommate on the morning of December 28, 2007. At a hearing on the motion, Ford argued that the fact that *482 a text message regarding the incident was sent was admissible but that the exact language of the text was not. The State argued that it intended to offer the substance of the message as an excited utterance. The court overruled Ford's motion in limine.
At trial, C.H. testified that 10 minutes elapsed between the sexual encounter with Ford and the text message and that she was "scared" and "confused" when she sent it. The prosecutor then asked C.H. to state the substance of the text message, arguing in response to Ford's hearsay objection that it fell within the excited utterance exception to the hearsay rule. The district court overruled the objection, concluding that the text message was both an excited utterance and "part of the res gestae of this crime." C.H. then testified that the text message stated, "I had just got raped by Jake. Don't know what to do." C.H. further testified that a police officer took both a photograph of the contents of the text message from the screen of her cellular telephone and a photograph showing the date and time of its transmission. When the State offered these photographs in evidence, Ford reasserted his previously made hearsay objection. The district court overruled the objection and received the photographs. One of the 8-by 10-inch color photographs shows the substance of the message: "I just got raped.. By jake.. I dont know what to do.." The other shows the date and time when the message was sent and delivered.

(b) Disposition
We understand Ford's argument as being twofold. First, he contends that the admission of the photograph went beyond the scope of the "complaint of rape" rule, under which the victim of a sexual assault may testify to a complaint regarding a sexual assault made within a reasonable time after it occurs, but not as to the details of the complaint.[13] Ford argues that under the "complaint of rape" rule, a limiting instruction must be given to advise the jury that testimony regarding the complaint is not to be considered as substantive evidence that the assault occurred. We note that Ford neither requested a limiting instruction at trial nor objected to the admission of the photograph based on the "complaint of rape" rule. Ford requests that we review this under the plain error doctrine. However, it is clear from the record that the district court also received the testimony and photographic evidence of the text message as an excited utterance, and Ford does not assign error to this independent basis for receiving the evidence. Accordingly, we do not reach Ford's argument with respect to the "complaint of rape" rule because it is unnecessary to do so; and we do not reach the question of whether the evidence was properly received as an excited utterance because Ford does not assign error with respect to this ruling.
Ford's second argument is that by receiving the photograph of the text message, to which C.H. had already testified, the court permitted the State to unduly emphasize a critical portion of C.H.'s testimony. Our cases impose significant restrictions on a jury's access to testimonial evidence during its deliberation.[14] But Ford did not raise this issue at trial; he objected to both the testimony about the text message and the admission of the photograph depicting the text message only on the ground of hearsay. When an issue is raised for the first time in an *483 appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.[15] Because the issue of whether the admission of the photograph constituted undue emphasis of the testimony was not preserved for appeal, we do not address it in this opinion.

4. FORD'S SUBSEQUENT SEXUAL CONDUCT

(a) Additional Background
During its case in chief, the State called a female witness and elicited her testimony that during the last part of December 2007, she and Ford were "[j]ust friends, trying to get to know each other." When the State asked if her relationship with Ford was more than a "friendship," Ford made a relevance objection. The State argued that the testimony was relevant because Ford told the police that he did not know why he had sex with C.H., and the State wanted to show that one reason why Ford was not interested in C.H. was that Ford was interested in the witness. The State specifically stated that it was "not asking about sexual behavior" and that the witness did not attend the party. The court allowed the witness to testify that her relationship with Ford developed into something more than just friends on or around December 27 or 28, 2007.
No further evidence relating to this witness was offered until the prosecutor cross-examined Ford about his cellular telephone records. During this cross-examination, the prosecutor asked whether Ford had been calling the woman who had previously testified during the period of December 24 or 25, 2007, until the time he initially spoke with the police on January 2, 2008, and Ford stated that he had. When Ford stated that he and the woman were friends, the prosecutor asked, "Well, that turned into something more, didn't it, Mr. Ford?" Ford's counsel objected on the basis of relevance, but the objection was overruled. The prosecutor asked, "Did your relationship with [the woman] ever develop past friendship?" Ford's counsel again objected to the question as irrelevant, and the court once again overruled the objection. The prosecutor then asked, "Did you engage in sexual intercourse with [the woman] during the last week of December?" Ford's counsel again made a relevance objection, which the court overruled. Ford then answered that he had not. Finally, the prosecutor asked whether Ford engaged in intercourse with the woman beginning in January 2008. No objection was made, and Ford answered in the affirmative.

(b) Disposition
In response to Ford's argument that the district court erred in permitting the prosecutor to elicit testimony about his sexual relationship with another woman commencing several days after the charged offense, the State contends that the issue is waived by Ford's failure to object to the question which elicited the response. We are not persuaded by this argument. Ford's counsel objected on relevance grounds throughout the line of questioning that led to the response, and his objections were consistently overruled. Although there was no objection to the question which immediately preceded the response, it is clear from the record that the prosecutor and the court were placed on notice of Ford's position that evidence of his sexual conduct subsequent to the charged offense was irrelevant.
*484 And we conclude that it was indeed irrelevant. Evidence is relevant if it tends in any degree to alter the probability of a material fact.[16] The State has offered no cogent explanation, at trial or on appeal, to support the relevance of Ford's sexual relationship with another woman after the date of the charged sexual assault on C.H. The district court erred in overruling Ford's objections to the line of questioning which elicited this information.

5. HARMLESS ERROR ANALYSIS
Having identified two trial errors, we must now consider whether they were prejudicial or harmless. In a jury trial of a criminal case, an erroneous evidentiary ruling results in prejudice to a defendant unless the State demonstrates that the error was harmless beyond a reasonable doubt.[17] Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.[18] Harmless error review looks to the basis on which the jury actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the guilty verdict rendered in the questioned trial was surely unattributable to the error.[19]
We have no difficulty concluding that the errors in sustaining the State's objections to testimony on the part of Ford's character witnesses as nonresponsive were harmless beyond a reasonable doubt, whether considered individually or in the aggregate. These rulings did not result in the exclusion of any evidence. In each instance that a nonresponsive objection and motion to strike was sustained, Ford's counsel was able to reformulate his question and elicit favorable testimony regarding Ford's reputation for peacefulness.
The erroneous admission of evidence of Ford's subsequent sexual conduct is another matter. The key factual issue in this case is whether C.H. consented to sexual intercourse with Ford. The only direct evidence on this issue came from the testimony of C.H. and Ford. Both, by their own admission, were significantly impaired by alcohol at the time of the sexual act. Both claimed that the other initiated the act. There was no evidence of physical or verbal resistance. The physical evidence was inconclusive. The erroneous admission of irrelevant evidence of Ford's subsequent sexual conduct with another woman could only have prejudiced him in the eyes of the jury. Given the sharply conflicting evidence on the issue of consent, we cannot say that the guilty verdict was surely unattributable to this error, and we therefore conclude that the State has not demonstrated that the error was harmless beyond a reasonable doubt.

V. CONCLUSION
The Double Jeopardy Clauses of the federal and state Constitutions do not forbid a retrial after an appellate determination of prejudicial error in a criminal trial so long as the sum of all the evidence admitted by the trial court, whether erroneously or not, would have been sufficient *485 to sustain a guilty verdict.[20] That is the case here. Therefore, for the reasons discussed, we reverse the judgment of the district court and remand the cause for a new trial.
REVERSED AND REMANDED FOR A NEW TRIAL.
NOTES
[1] State v. Epp, 278 Neb. 683, 773 N.W.2d 356 (2009); State v. Edwards, 278 Neb. 55, 767 N.W.2d 784 (2009).
[2] State v. Edwards, supra note 1.
[3] State v. Sanchez-Lahora, 261 Neb. 192, 622 N.W.2d 612 (2001).
[4] § 28-321(2)(b) (emphasis supplied).
[5] § 28-321(2)(a).
[6] See State v. Lessley, 257 Neb. 903, 601 N.W.2d 521 (1999).
[7] State v. Moyer, 271 Neb. 776, 715 N.W.2d 565 (2006); State v. Diaz, 266 Neb. 966, 670 N.W.2d 794 (2003).
[8] Brief for appellant at 18.
[9] Cardenas v. Peterson Bean Co., 180 Neb. 605, 609-10, 144 N.W.2d 154, 158 (1966).
[10] Isham v. Birkel, 184 Neb. 800, 801-02, 172 N.W.2d 92, 93 (1969).
[11] State v. Swoopes, 223 Neb. 914, 395 N.W.2d 500 (1986), overruled in part on other grounds, State v. Jackson, 225 Neb. 843, 408 N.W.2d 720 (1987).
[12] Id. at 920, 395 N.W.2d at 505. See, also, R. Collin Mangrum, Mangrum on Nebraska Evidence 34 (2009).
[13] See State v. Daniels, 222 Neb. 850, 388 N.W.2d 446 (1986).
[14] See, State v. Bao, 263 Neb. 439, 640 N.W.2d 405 (2002); State v. Dixon, 259 Neb. 976, 614 N.W.2d 288 (2000).
[15] State v. Thompson, 278 Neb. 320, 770 N.W.2d 598 (2009); State v. Pieper, 274 Neb. 768, 743 N.W.2d 360 (2008).
[16] State v. Draganescu, 276 Neb. 448, 755 N.W.2d 57 (2008); State v. Schreiner, 276 Neb. 393, 754 N.W.2d 742 (2008).
[17] State v. Epp, supra note 1; State v. Morrow, 273 Neb. 592, 731 N.W.2d 558 (2007), disapproved on other grounds, State v. McCulloch, 274 Neb. 636, 742 N.W.2d 727 (2007).
[18] Id.
[19] Id.
[20] See, Lockhart v. Nelson, 488 U.S. 33, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988); State v. McCulloch, supra note 17.