IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

STATE V. VANCE

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,
V.
JERIMIAH L. VANCE, APPELLANT.

Filed January 20, 2015.   No. A-14-009.

Appeal from the District Court for Lancaster County: JOHN A. COLBORN, Judge. Affirmed.

Dennis R. Keefe, Lancaster County Public Defender, and Shawn Elliott for appellant.

Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.

MOORE, Chief Judge, and RIEDMANN and BISHOP, Judges.

MOORE, Chief Judge.

Following a jury trial, Jerimiah L. Vance was convicted of aggravated first and third degree sexual assault. He was sentenced to concurrent prison sentences of 40 to 70 years and 4 to 5 years. Vance appeals his convictions and sentences. Finding no errors, we affirm.

FACTUAL BACKGROUND

In October 2009, Vance and Amanda S. began a dating relationship. Their relationship progressed to the point that Vance began living on occasion with Amanda and her four children. During this relationship, Amanda and her family lived in three separate residences: a triplex in Ashland and a duplex and apartment in Lincoln. Vance also had two daughters of his own who would stay overnight with Amanda and her children while Vance visited Amanda in her Lincoln residences.

On February 17, 2012, Amanda's 4-year-old daughter A.S. complained to her mother of pain in her "butt." H.S., Amanda's son and A.S.' twin brother, made a statement which led Amanda to question A.S. as to whether "someone had put a pee pee in her butt." A.S. denied this

had occurred approximately 8 to 10 times before she admitted that it had occurred and began crying. Amanda took A.S. to a hospital that night around 8 o'clock for an evaluation.

At the hospital, A.S. underwent an assessment by an emergency room nurse. The nurse performed a quick visual examination (exam) of A.S., observing that A.S.' genitals were a little red and irritated and that she noticed a "little bit" of white discharge. The assessment lasted a total of 5 to 10 minutes, and no acute trauma was discovered. X rays were taken of A.S.' abdomen which led to the conclusion that the pain in her bottom was caused by constipation. That night, the hospital contacted the police about a possible case of child abuse. An officer was dispatched to the hospital and performed an initial investigation that night. At his request, the nurse took photographs of A.S.' genital area. The officer referred the case to the Family Crimes Unit of the Lincoln Police Department for further investigation.

On February 21, 2012, A.S. and H.S. were interviewed at the Child Advocacy Center by Brytten Sorgenfrei, an investigator for the Family Crimes Unit. Each child's interview lasted approximately 30 to 45 minutes. A.S. also underwent a medical exam at the Child Advocacy Center, and the results of the exam were normal with no signs of injury present.

On February 22, 2012, Sorgenfrei and another investigator visited Amanda's apartment to collect evidence. The investigators took pictures as they entered the apartment, focusing on A.S.' bedroom and the path through the apartment leading to the bedroom. A.S. and H.S. shared a bedroom in the apartment, and their beds were bunked. H.S. slept in the top bunk, and A.S. slept on the bottom. In addition to taking pictures, Sorgenfrei collected A.S.' bedding for DNA and serology testing. The bedding consisted of a cotton-like mattress pad, a brown fitted sheet, a brown flat sheet, a cream-colored comforter, and a pink heart-patterned quilt. The State Patrol crime laboratory received the bedding on March 1, 2012. Testing was not completed until August 2012.

On October 31, 2012, Sorgenfrei reinterviewed Amanda at her apartment. During this interview, Sorgenfrei informed her that the testing conducted on the bedding revealed that semen was on the quilt and comforter. Sorgenfrei also informed Amanda that A.S. needed to participate in a second interview at the Child Advocacy Center. On November 6, A.S. participated in a second interview which lasted at least an hour.

Amanda stated that she ceased all communication with Vance the night she took A.S. to the hospital. However, 4 to 6 weeks later, Amanda and Vance rekindled their relationship and dated for another 5 months. Amanda's last contact with Vance occurred on August 18, 2012.

On January 2, 2013, Sorgenfrei collected a buccal swab from Vance. On February 1, Sorgenfrei interviewed Vance for about 2 hours at the Lincoln Police Department. During this interview, Sorgenfrei told Vance for the first time that his semen was on A.S.' bedding. Following the interview, Vance was arrested.

The State charged Vance with one count of first degree sexual assault of a child and one count of third degree sexual assault of a child. The information asserted that Vance committed these offenses between August 1, 2009, and October 31, 2012. The State declared that both offenses qualified as aggravated offenses under Neb. Rev. Stat. § 29-4001.01(1) (Cum. Supp. 2014) because A.S. was under 13 years of age.

A jury trial commenced in the district court for Lancaster County on October 7, 2013. Prior to trial, the State designated Sorgenfrei to be its representative at trial and moved that she

be excluded from any witness sequestration order. The district court granted the State's motion over Vance's objections.

A.S. was the State's first witness at trial. Prior to her testimony, the court examined A.S. outside of the presence of the jury. A.S. was able to tell the court her name, her age, the name of her school and grade, and that she lived with her mother and brothers. However, A.S. could not state exactly where she lived. A.S. also answered that she understood what it meant to tell the truth and that she would get a "time out" if she told a lie. The court had A.S. raise her right hand, and she promised to tell the truth. Vance's attorney then asked A.S. a number of questions regarding whether she remembered her interviews at the Child Advocacy Center or watching the videos of those interviews. A.S. could not remember participating in the interviews, but she was able to recall having watched a video during which she talked with another girl about Vance. A.S. also reported that she could not read well. Over Vance's objection, the district court concluded A.S. was competent to testify.

The court also similarly questioned A.S. in the presence of the jury before her testimony. Again, A.S. was able to state her age, the name of her school and her grade, and that she lived with her mother and brothers. A.S. also stated that she would get into trouble if she told a lie. The court also posed a hypothetical statement which A.S. was able to correctly identify as a lie. Vance renewed his objection to A.S.' testimony on the grounds that she was not competent and would not be available for cross-examination. The court overruled the objection.

A.S. testified that Vance used to stay at their house and that she was in court because Vance had done something bad to her. At the outset of her testimony, A.S. was presented with basic diagrams of a young girl and an adult male. Upon questioning, A.S. was able to identify the various body parts on each diagram. A.S. testified that Vance put his finger in her "toki [vagina]" and put his "pee pee in her butt." A.S. described feeling pain when Vance put his finger in her "toki," but testified that she felt nothing when he put his "pee pee in her butt." She also stated that she and H.S. shared a room when Vance did these things to her, but that she believed H.S. did not observe anything because he was asleep. A.S. testified that Vance would come into her room at night, lay in her bed, and pull her pants down. Vance's clothes would also be partly off. When Vance did these things to her, A.S. noticed that the bed would get all wet. A.S. also testified that these things happened more than once and that they occurred when her family lived at "the old house," which refers to the duplex. A.S. denied that Vance did anything to her when they lived in the apartment. A.S. could not remember how old she was when Vance did these things to her.

On cross-examination, A.S. admitted that she would take her heart-patterned blanket out of her bedroom and carry it with her throughout the apartment. However, she denied that she would go into her mother's room and climb into her bed while her mother and Vance were sleeping. A.S. testified that she actually remembered Vance putting his "pee pee in her butt." A.S. recalled having spoken with various people about her testimony, but could not remember the occasions. She also stated that she was testifying to some things that she had been told by others. A.S. was not able to read portions of the transcripts of her prior interviews at the Child Advocacy Center.

H.S. also testified at trial after the court determined that he was competent. However, during his testimony, H.S. announced that he did not want to talk about Vance. H.S. did not testify as to any observations of Vance performing any acts on A.S.

Amanda testified that she and her children moved into the duplex in Lincoln in 2010 and that they lived there until August 2011. According to Amanda, Vance lived with them most of the time and had unlimited access to her children any time he was there. Amanda described the residence and testified that A.S. and H.S. shared a bedroom. Their beds were side by side, although they could have been bunked.

From August 2011 through October 2012, Amanda and her children lived in a Lincoln apartment. Amanda testified that Vance did not live with her family in the apartment, but would stay with them on occasion. She estimated that Vance lived with them 15 to 20 percent of the time. While they were living in the apartment, Amanda's mother gave A.S. the heart-patterned quilt as a Christmas present. In the apartment, A.S. and H.S. shared a bedroom in which their beds were bunked. A.S.' bed was on the bottom.

Amanda acknowledged that she and Vance often had sexual relations. She also admitted that A.S. once walked into her bedroom at night while she and Vance were naked and engaged in sexual activity. According to Amanda, A.S. would sometimes come into her room at night and crawl into the bed if she was scared or had bad dreams. Finally, Amanda admitted to having performed oral sex on Vance in the apartment living room while the children were present, but stated that she covered her head with a black fuzzy blanket. Amanda denied that she and Vance ever had sex in A.S.' bedroom or used A.S.' bedding during sex.

Barbara Sturgis, a clinical psychologist, provided general testimony regarding children's disclosure of sexual abuse. Prior to her testimony, Sturgis had not evaluated A.S. or H.S. Sturgis testified that a child's disclosure of sexual abuse is often a gradual process and may even be accidental, with children often first disclosing a small portion of what occurred in order to gauge the adult's reaction. Because of this, Sturgis acknowledged that multiple interviews of the child are necessary. Sturgis also stated that children will have difficulty explaining when certain events took place because time is still an abstract concept for them.

Heidi Young, a forensic scientist in the biology unit at the State Patrol crime laboratory, testified to her findings after she completed the DNA and serology tests on A.S.' bedding. Young discovered three stains on the bedding that contained sperm: two from the heart-patterned quilt and one from the cream-colored comforter. These stains were in the bottom corners of each piece of bedding. Each of these stains tested as containing sperm, and Young's analysis revealed that the odds of Vance's not having been the source of these stains were extremely remote. Although Young was able to determine that these stains contained sperm, she could not determine how the DNA was deposited onto the bedding or how long it had been on the bedding. Young did not find any other stains containing sperm on the remaining items of A.S.' bedding.

The medical director at the Child Advocacy Center, who is a general pediatrician, testified that she had reviewed the records from A.S.' medical exam at the Child Advocacy Center and concluded that the exam was normal. The director also testified that a medical examiner will find signs of injury in child abuse cases in less than 5 percent of the time. According to the director, the hymen has a great capacity to heal in young children.

After the State rested, Vance presented three witnesses in his defense. His sister testified that she visited Vance while he was staying with Amanda and her children. She described Vance as a father figure in that home. She recalled how Amanda's older sons would often fight and cuss, and she specifically recalled observing them pretend to "hump" A.S. Vance's sister described Amanda's household as being dirty and messy in both the duplex and the apartment.

A longtime friend of Vance also testified that he had visited Vance at Amanda's residences and observed these residences to have been messy. Vance's friend recalled that Amanda would perform oral sex on Vance while he was also in the room with them. He also claimed that Amanda once danced naked in front of him and Vance at her residence. Vance's friend echoed Vance's sister's concerns about the behavior of Amanda's older sons.

Finally, the forensic interviewer at the Child Advocacy Center who interviewed A.S. and H.S. testified to the substance of A.S.' first interview at the Child Advocacy Center on February 21, 2012. She testified that A.S. did not disclose during that interview having experienced any abuse from Vance, but did state that H.S. had put markers in her "toki." The forensic interviewer testified that A.S. was active during the interview and repeatedly asked to leave.

During his closing argument, Vance contended that the State had not presented sufficient evidence to convict him of the sexual assault charges. He argued that A.S. was not a credible witness because there were inconsistencies in her testimony and because she could not remember many details of what she had experienced. He reasoned that A.S.' testimony could likely be from what she witnessed inside her home and that she never actually suffered any abuse. He also highlighted that the DNA evidence could not prove his guilt because the stains were in the lower corners of the quilt and comforter. Vance theorized that A.S.' bedding must have been present while he and Amanda were having sexual relations. Vance's attorney emphasized that Vance was a good father and that he had maintained his innocence throughout his interview with the police.

The jury convicted Vance of both first and third degree sexual assault. The court sentenced him to concurrent sentences of imprisonment of 40 to 70 years and 4 to 5 years. Vance appeals.

## ASSIGNMENTS OF ERROR

Vance assigns as error that the district court erred (1) in permitting the State to designate the lead investigator as a representative throughout the trial, despite a sequestration order; (2) in overruling his motion for mistrial after a juror had disclosed for the first time that she had been the victim of a sexual assault; (3) in allowing the victim to testify when she was not competent; (4) in failing to strike the testimony of the victim when she became unavailable for cross-examination; (5) in permitting the State to introduce the hearsay statement of the victim; (6) in failing to declare a mistrial after the prosecutor misstated evidence during closing arguments; (7) in finding sufficient evidence to sustain the jury's verdicts; and (8) in imposing excessive sentences.

## STANDARD OF REVIEW

The question of competency of a child witness lies within the discretion of the trial court, and that determination will not be disturbed in the absence of an abuse of discretion. *State v.*

*Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997). The question as to the competency of a witness must be determined by the court, while the credibility and the weight of the testimony are for the jury to determine. *Id*.

Whether to grant a motion for mistrial is within the trial court's discretion, and an appellate court will not disturb its ruling unless the court abused its discretion. *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014).

In reviewing a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Berney*, 288 Neb. 377, 847 N.W.2d 732 (2014).

ANALYSIS

*Designation of Sorgenfrei as State's*
*Representative at Trial.*

Vance asserts that the district court erred in permitting the State to designate Sorgenfrei as its representative and excluding her from the witness sequestration order. He contends that Sorgenfrei's presence at counsel table unfairly bolstered A.S.' testimony and denied his right to a fair trial.

According to Neb. Rev. Stat. § 27-615 (Reissue 2008), the general rule is that witnesses shall be excluded from a proceeding at the request of a party. The rule has certain exceptions, including a person whose presence is shown by a party to be essential to the presentation of the party's case. See *In re Interest of Dennis W.*, 14 Neb. App. 827, 717 N.W.2d 488 (2006). In *State v. Freeman*, 267 Neb. 737, 677 N.W.2d 164 (2004), the Nebraska Supreme Court upheld the trial court's decision to allow the State to designate a deputy sheriff as its representative and sit through the trial even though a sequestration order had been entered. We see no reason to adopt a different result in this case.

There is no evidence to support Vance's contention that Sorgenfrei's presence throughout the trial somehow aided A.S.' testimony. The district court correctly concluded that, based on the complexity of this case, Sorgenfrei's presence was necessary to aid the State in its presentation of the case. This assignment of error is without merit.

*Motion for Mistrial During Voir Dire.*

During voir dire, the State questioned the prospective jurors about whether they knew anyone who was a victim of sexual assault. In response to this question, Juror N.D. responded that she had been the victim of sexual assault. She also indicated that this was the first time she had spoken of her experience. At this disclosure, Juror N.D. began crying in front of the entire panel.

Another juror, Juror G.A., also disclosed that she had been the victim of a sexual assault when she was young. Juror G.A. informed the court that she had never spoken of the assault

previously and had difficulty controlling her emotions when Juror N.D. disclosed her experience. The court excused both Juror N.D. and Juror G.A. from serving on the jury.

After the State passed the jury panel for cause, Vance moved for a mistrial. He argued that he was concerned that Juror N.D.'s disclosure, and the manner of that disclosure, created a prejudicial atmosphere against Vance. The State opposed Vance's motion and suggested that the panel could be asked whether anything had occurred that would impact its impartiality. The court agreed with the State and overruled Vance's motion.

Later, two additional prospective jurors also disclosed having been the victims of sexual assault. The first juror requested to be excused after acknowledging that her experience would affect her ability to be impartial. This disclosure occurred outside the presence of the rest of the prospective jurors. The court excused this juror. However, the other prospective juror stated that her experience would not affect her ability to be fair and impartial. This prospective juror was apparently stricken by one of the parties and did not actually serve.

Vance did not question the remaining prospective jurors whether the disclosures of any of the jurors regarding being victims of sexual assault would impact their partiality. Vance renewed his motion for mistrial after he finished his voir dire. Again, the court overruled the motion, finding no indication that the jurors were influenced.

On appeal, Vance argues that Juror N.D.'s disclosure before the panel was highly unusual. He contends that this disclosure, when combined with the gravity of the first degree sexual assault allegation, should have required the court to declare a mistrial.

A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014).

The district court did not abuse its discretion when it refused to grant a mistrial. There is nothing in the record to show that Juror N.D.'s disclosure had any damaging effect upon any of the jurors who actually served on the jury or otherwise prejudiced Vance. This assigned error is without merit.

*Competency of A.S. to Testify.*

Vance also argues that the district court erred when it determined that A.S. was competent to testify. Vance takes issue with this determination because he believes an objective review of her testimony reveals that A.S. had very little ability to recollect her experiences and then testify to those experiences. Vance claims that A.S.' incompetence requires this court to vacate his convictions.

While no certain age has been deemed to be the age at which a child becomes competent to testify in a court of law, the court generally takes into consideration whether he or she is able to receive correct impressions by the senses, to recollect and narrate accurately, and to appreciate the moral duty to tell the truth. *State v. Earl*, 252 Neb. 127, 560 N.W.2d 491 (1997). In *Earl*, the Nebraska Supreme Court upheld the district court's determination that a 6-year-old witness was competent to testify. The witness was able to report his name, his age, the street and city where he lived, his sister's name and age, his school and grade, the names of his teacher and principal,

the name of his father's workplace, and his mother's occupation. He was also able to demonstrate that he understood the difference between telling the truth and lying.

In this case, A.S. was able to report much of the same information. A.S. accurately answered the court's questions regarding her age, her school, and her grade in school, and she was able to state that she lived with her mother and brothers. However, she was not able to recall exactly where she lived. A.S. also reported that she knew what it meant to tell the truth and that she could get a timeout if she told a lie. At the court's direction, A.S. also raised her hand and promised to tell the truth. In front of the jury, A.S. also answered the judge that his robe was black and that his statement that his robe was pink would be a lie.

Vance does not take issue with any of the above facts, but focuses on A.S.' inability to remember all of the details of her experiences with Vance. However, A.S.' inability to accurately remember and narrate certain events does not go to her competency. Rather, these are credibility issues for the jury to consider.

Based on this record, we agree with the district court's determination that A.S. was competent to testify.

*Motion to Strike A.S.' Testimony.*

After Amanda's testimony, Vance moved to strike A.S.' testimony because he argued that she was unavailable for cross-examination. Vance emphasizes that A.S.' frequent responses of "I can't remember" or "I don't know" to his questions on cross-examination demonstrate her unavailability. A.S. was unable to recall what she had stated during her interviews at the Child Advocacy Center and, due to her age, was not able to read the transcripts from those interviews. On appeal, Vance contends that the district court abused its discretion when it overruled his motion to strike.

Vance and the State both agree that this issue is properly analyzed under the U.S. Supreme Court's decision in *United States v. Owens*, 484 U.S. 554, 108 S. Ct. 838, 98 L. Ed. 2d 951 (1988). Neither party cites a Nebraska case applying that decision, and we have not found any such case in our research. In *Owens*, the government charged a federal prisoner with assault of a prison counselor. The prisoner beat the counselor with a metal pipe, fracturing the counselor's skull. The counselor was hospitalized for over a month, and his memory was impaired as a result of the beating. Four weeks after the assault, the counselor was able to describe what occurred and identified the prisoner as his attacker from an array of photographs.

At trial, the counselor testified that he remembered identifying the prisoner as the attacker. However, he was not able to recall many other details. On cross-examination, the prisoner's attorney attempted to refresh the counselor's recollection with hospital records, including a record in which the counselor had identified a different attacker. These attempts were unsuccessful, and the prisoner was convicted.

The U.S. Supreme Court reversed the federal court of appeals decision overturning the conviction. The Supreme Court held that the Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. When the defense has the opportunity to bring out such matters as the witness' bias, lack of care and attentiveness, poor eyesight, or bad memory, the Confrontation Clause is satisfied.

Vance argues that he did not have the opportunity to cross-examine A.S. because she had no true recollection of the abuse. He focuses on the fact that A.S. testified that she was talking about things that had been told to her. However, our review of the record shows that A.S. testified to her actual memory of Vance's putting his "pee pee in her butt" while she was living in the old house. A.S. also testified that it hurt when Vance put his fingers in her "toki."

The record also shows that Vance had the opportunity to cross-examine A.S. and highlight before the jury her lack of memory of many details. Vance then argued in his closing that A.S.' inability to recall many details should make her testimony unbelievable. Although he was not able to achieve his desired result, he was able to cross-examine A.S. The district court correctly overruled Vance's motion to strike A.S.' testimony.

*Amanda's Testimony as to Reason*
*for Taking A.S. to Hospital.*

Vance assigns as error the district court's determination that Amanda was allowed to testify to A.S.' statement which led to their visit to the hospital. Specifically, Vance argues that Amanda should not have been permitted to testify as to H.S.' initial statement which led to her questioning of A.S. Vance also argues that Amanda could not testify to A.S.' answers in response to her questions. Vance focuses his arguments on the complaint of rape rule and argues that this doctrine should be abandoned. Under the complaint of rape rule, the victim of a sexual assault may testify to a complaint regarding a sexual assault made within a reasonable time after it occurs, but not as to the details of the complaint. See, *State v. Ford*, 279 Neb. 453, 778 N.W.2d 473 (2010); *State v. Daniels*, 222 Neb. 850, 388 N.W.2d 446 (1986).

In response to Vance's hearsay objection at trial, the State offered two responses. First, the State declared that it was not offering H.S.' statement for the truth of the matter asserted. The State claimed that H.S.' statement was not hearsay because it was being offered to show why A.S. was taken to the hospital. Further, the State claimed that the complaint of rape doctrine would allow Amanda to testify to A.S.' response to Amanda's questioning. When questioned in front of the jury, Amanda testified that H.S. made a statement which led her to question A.S. Then, A.S. responded "yes" to her question of whether someone had put a "pee pee in her butt." Upon Vance's hearsay objection, the court overruled the objection and gave the following instruction to the jury:

> All right, ladies and gentlemen of the jury, this questioning where [A.S.] made a statement to the witness; and that [H.S.] said something; and then [A.S.] was asked a question; and her responses; all of those are not being received for the truth of the matter asserted therein. They're simply being received for the fact that the statements were made. In other words, they're not substantive evidence, but you can consider the fact that the statements were made, but not the truth of the matter asserted therein.

Vance's objection at trial to Amanda's testimony regarding what A.S. and H.S. told her was based on hearsay. The trial court found that these statements were not hearsay as they were not offered for the truth of the matter asserted. We agree. These statements were offered to show why Amanda took A.S. to the hospital for an evaluation. The trial court also instructed the jury that these statements were being received only for the fact that they were made and not for their substance. We find no abuse of discretion in the court's overruling of Vance's hearsay objection

to Amanda's testimony regarding what A.S. and H.S. told her. We need not discuss the complaint of rape doctrine and its applicability in this case. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *State v. Planck*, 289 Neb. 510, 856 N.W.2d 112 (2014).

*Motion for Mistrial During Closing Arguments.*

During the State's closing argument, the county attorney twice stated that Amanda asked A.S. whether Vance had put his "pee pee in her butt." After the second reference to this question, Vance objected and moved for a mistrial pointing to the court's earlier ruling as to the admissibility of H.S.' statement and the limiting instruction the court had given. The district court overruled the motion for mistrial, but did strike that portion of the State's closing argument and instructed the jury not to consider that portion of the argument.

Generally, in assessing allegations of prosecutorial misconduct in closing arguments, a court first determines whether the prosecutor's remarks were improper. *State v. Green*, 287 Neb. 212, 842 N.W.2d 74 (2014). It is then necessary to determine the extent to which the improper remarks had a prejudicial effect on the defendant's right to a fair trial. *Id*. Before it is necessary to grant a mistrial for prosecutorial misconduct, a defendant must show that a substantial miscarriage of justice has actually occurred. *Id*. A mistrial is properly granted in a criminal case where an event occurs during the course of a trial which is of such a nature that its damaging effect cannot be removed by proper admonition or instruction to the jury and thus prevents a fair trial. *Id*.

Vance argues that the State's remarks were improper because they misstated evidence and directly identified Vance as having assaulted A.S. The State does not contend that these comments were not improper, but, rather, it asserts that Vance did not suffer any prejudice because the court struck that portion of the State's closing argument and instructed the jury not to consider it.

We agree with the State that Vance did not suffer any prejudice as a result of the State's comments. Immediately after his objection, the district court informed the jury that it was striking the last portion of the State's argument and admonished the jury not to consider it. Further, the State did not refer to this statement at any other point in its closing. The district court properly denied Vance's motion for a mistrial.

*Sufficiency of Evidence.*

A person commits first degree sexual assault of a child if he or she subjects another person under 12 years of age to sexual penetration and the actor is at least 19 years of age or older. Neb. Rev. Stat. § 28-319.01 (Cum. Supp. 2014). Neb. Rev. Stat. § 28-318(6) (Cum. Supp. 2014) defines sexual penetration as

> sexual intercourse in its ordinary meaning, cunnilingus, fellatio, anal intercourse, or any intrusion, however slight, of any part of the actor's or victim's body or any object manipulated by the actor into the genital or anal openings of the victim's body which can be reasonably construed as being for nonmedical or nonhealth purposes. Sexual penetration shall not require emission of semen.

It is not necessary that the vagina be entered or that the hymen be ruptured; the entry of the vulva or labia is sufficient. *State v. Archie*, 273 Neb. 612, 733 N.W.2d 513 (2007).

A person commits third degree sexual assault of a child if he or she subjects another person 14 years of age or younger to sexual contact and the actor is at least 19 years of age or older and does not cause serious personal injury to the victim. See Neb. Rev. Stat. § 28-320.01(1) and (3) (Reissue 2008).

Vance's arguments on appeal regarding the sufficiency of the evidence to sustain his convictions were presented to the jury at trial and rejected. Vance argues that A.S.' testimony was not believable and that the DNA evidence likely was deposited on A.S.' bedding while he was having sexual encounters with Amanda. However, this court does not reweigh the evidence, resolve conflicts in the evidence, or weigh the credibility of witnesses. See *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014).

Having reviewed the record, we conclude there was sufficient evidence for the jury to find Vance guilty of both first and third degree sexual assault. This assigned error is without merit.

*Excessive Sentences.*

Vance was convicted of both first and third degree sexual assault. First degree sexual assault is a Class IB felony with a mandatory minimum sentence of 15 years' imprisonment and a maximum sentence of life imprisonment. § 28-319.01(2); Neb. Rev. Stat. § 28-105 (Cum. Supp. 2014). Third degree sexual assault is a Class IIIA felony which carries with it a maximum sentence of 5 years' imprisonment. § 28-320.01; § 28-105. The district court sentenced Vance to 40 to 70 years' imprisonment for first degree sexual assault of a child and 4 to 5 years' imprisonment for third degree sexual assault of a child. The court ordered these sentences to be served concurrently.

Vance acknowledges that his first degree sexual assault conviction commands a minimum 15-year sentence of imprisonment. He contends, however, that his sentence should have been no greater than this mandatory minimum. Vance points to the facts that he was a good father to his two daughters, was gainfully employed prior to his arrest, and had never committed a similar offense as support for his claim that his sentences were excessive.

When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record and record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense, and (8) the amount of violence involved in the commission of the crime. *State v. Tolbert*, 288 Neb. 732, 851 N.W.2d 74 (2014). The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts surrounding the defendant's life. *State v. Leibel*, 286 Neb. 725, 838 N.W.2d 286 (2013).

The presentence report reveals that Vance was 33 years old at the time of the report. Vance has a criminal history which includes numerous traffic violations, three driving under the influence offenses, assault, and attempted manufacture of a controlled substance. Vance's total score on the level of service/case management inventory assessment placed him in the medium risk to reoffend. Vance maintained his claims of innocence during the presentencing process and at sentencing.

The court announced at sentencing that it had considered the presentence report along with the nature and circumstances of the crime and the age of the victim. The court determined that a lengthy term of imprisonment was necessary to protect the public and that a lesser sentence would depreciate the seriousness of Vance's crimes and promote disrespect for the law.

We conclude that the sentences imposed by the district court were not excessive and that the court did not abuse its discretion when it sentenced Vance within the statutory limits.

## CONCLUSION

Having found no merit to any of Vance's assigned errors, we affirm his convictions and sentences.

AFFIRMED.